OSSIE GRANT, Plaintiff-Appellant, *v.* JOSEPH J. DUFFY COMPANY, Defendant-Appellee.

(No. 56165; ▮▮▮▮▮▮▮)

First District (2nd Division)—June 25, 1974.

*Rehearing denied July 26, 1974.*

Nat P. Ozmon and Joseph F. Cerveny, both of Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago (Dario A. Garibaldi, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Leonel I. Hatch, Jr., D. Kendall Griffith, and Stanley J. Davidson, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Ossie Grant, plaintiff-appellant, was injured on October 22, 1962, when the scaffold upon which he was standing collapsed. At the time of the accident plaintiff was employed by Adjustable Forms, Inc. (Ad-

justable), which company was the subcontractor for the construction and removal of wooden forms used in laying concrete. Defendant-appellee Joseph J. Duffy Co. performed the services of general contractor for the Atomic Energy Commission (AEC) pursuant to its contract with that federal government agency to build a High Energy Physics Building (ZGS building) at Argonne National Laboratory (Argonne) near Lemont, Illinois.

Plaintiff brought suit under the Illinois Structural Work Act (Ill. Rev. Stat. 1963, ch. 48, pars. 60—69) against defendant, which company, in turn, filed a third-party complaint against Adjustable. This latter complaint was subsequently dismissed by order of the court pursuant to stipulation of the defendant and Adjustable.

The case was tried on plaintiff's amended complaint based on the Structural Work Act which charged that as a direct and proximate result of the wilful violation of the provisions of the Act and defendant's allowance of an unsafe, unsuitable, improper and unsecured scaffolding, plaintiff sustained certain severe and permanent injuries. Defendant's answer admitted it was in charge of the overall erection and construction of the subject building but denied being in charge of the specific portion of the building or instrumentality alleged to be the cause of the injury, denied any wilful violations of the Act, and further denied that if the scaffold did break, fall, collapse or give way and the plaintiff thereafter fell, it was not the direct or proximate result of any violation of the Act.

The matter was tried before a jury and, at the close of the plaintiff's case, his motion for a directed verdict on the issue of liability was denied. The jury returned a verdict in favor of defendant and, having denied plaintiff's motion for a judgment notwithstanding the verdict, the trial court entered judgment on the verdict.

Plaintiff's appeal presents the following issues:

1) whether the trial court erred in refusing to admit into evidence the testimony of two similar prior accidents;

2) whether the trial court properly denied plaintiff's request to admit into evidence certain provisions of the contract between the defendant and the AEC;

3) whether the trial court erred in refusing to direct a verdict in favor of the plaintiff; and

4) whether the trial court erred in the giving and refusing of certain instructions to the jury.

It is our conclusion that for the reasons set out later in this opinion, the cause should be reversed and remanded for a new trial. We shall only set forth such facts as are pertinent to the reasons for our conclusions.

At the time of the accident, construction of the ZGS building had progressed to the point that the foundation had been laid, the steel framework substantially completed, and the concrete floors on each of the three stories almost finished.

Before pouring the concrete the record indicates that the usual procedure is to lay out wooden forms, pour the concrete onto these forms, and, once the concrete has set to form a solid floor, remove the forms. This last process is known as "stripping" and, in the instant case, the laborers were unable to "strip" the wooden floors without the use of scaffolds.

The evidence indicates that the scaffolds used were of a hanging variety and were assembled by first placing a 4-by-4-inch cross bar approximately 8 to 10 feet in length between two "I-beams" so that the ends of the cross bar rested on the portions of the I-beams that project to form a ledge. Two large, "S"-shaped hangers, shaped from round ¾-inch steel bars, are then hung at either end of the cross bar. Each end of a hanger is split, resembling a fish hook, and the hangers can be 6, 7, or 8 feet in length. Another 4-by-4-inch cross bar is then suspended across the lower portions or "hooks" of the two hangers. A short distance away an identical structure is assembled and two 2-by-12-inch boards (approximately 16 feet in length) are suspended between the lower 4-by-4-inch cross bars of each hanging structure. Finally, these 2-by-12-inch boards are covered with a piece of plywood. The laborers would then stand on this scaffold and "strip" or remove the wooden forms above them.

The plaintiff testified that at about 2:30 P.M. on October 22, 1962, he was on a scaffold stripping 4-by-4-inch boards from the ceiling above him when "all at once, all I knew, I was lying down on the ground, on the floor." The plaintiff did not return to work until January, 1964. On cross-examination the plaintiff stated that a piece of plywood had fallen and knocked him from a scaffold before the particular incident giving rise to this suit but, since the question initiated what the court determined was an improper attempt to impeach the witness, the question and answer were stricken. Plaintiff stated the plank on which he was standing at the time of the accident was approximately 5 feet above the floor. However, other witnesses placed the scaffold at either 6 or 7 feet above the floor.

Eligha Tanner testified that during October, 1962 he was working as a stripper for Adjustable; that at the time of the accident his scaffold was 10 to 12 feet from the plaintiff's scaffold; that the foreman's (Larry McCabe's) scaffold was 4 to 5 feet from plaintiff's but connected to it with a 4-by-8-foot piece of plywood; that it was a windy day and, as

plaintiff pulled down a piece of plywood, it "sailed," hit plaintiff's scaffold knocking one of the hangers from beneath the 4-by-4-inch cross bar, and that plaintiff and the scaffold fell to the floor below.

Tanner further testified that this sort of swinging scaffold had been used at the job site during the 2 months prior to the accident; that defendant's assistant superintendent Wagner had on more than one occasion come to the area where the scaffolding was being used; that the witness had seen other of defendant's supervisory people in the scaffolding area; and that he had had difficulty with the scaffolds prior to October 22, 1962.

On or about October 10, 1962, as Tanner was working on one of three scaffolds, a piece of plywood flew in the wind and knocked the hanger from beneath the 4-by-4-inch cross bar causing the scaffold to fall from under the witness. He grabbed a steel beam and swung in the air until someone brought him a ladder. Tanner stated that, immediately after his mishap, he walked over to defendant's assistant superintendent Wagner and asked if there was any way to make the scaffold safer since he was afraid.

Approximately 3 to 4 days prior to the October 10 incident Tanner and one other man were stripping from the same scaffold. In order to remove a particular piece of plywood both men had to stand at one end of the scaffold and, as they pulled down the wood, it swung and knocked a hanger from under the cross bar. Tanner stated that assistant superintendent Wagner was present during this incident.

Tanner, who had been working for Adjustable at the site for about 2 months prior to the October 22 incident, testified about another such mishap which occurred about 3 weeks after Tanner had begun working at Argonne. One Ledbetter was working with Tanner on the scaffold and, as they pulled a piece of plywood from above them, it knocked the hanger from under the cross bar and the scaffold fell. As the witness began to recount yet one more mishap with the scaffold the trial court sustained defense counsel's objection to such on the ground that, since the witness stated that in this incident, as in the one preceding it, both he and Ledbetter were on the same scaffold, the situation was not physically similar to the plaintiff's accident since in the latter plaintiff was the only person on the scaffold. For this same reason the court instructed the jury to disregard Tanner's testimony of all but the incident occurring on or about October 10, 1962, regardless of the fact that in each situation the scaffolds were similar.

On cross-examination the witness stated that the lower 4-by-4 cross bars were usually 12 feet long and that it was customary for them to overlap the hangers for a space of 4 to 6 inches.

Other witnesses testified on behalf of the plaintiff: *e.g.*, a supervisor of Adjustable who testified concerning the physical characteristics of the subject scaffold; one Eden, an employee of Adjustable whose duties involved assembling and dismantling the scaffolds was not permitted to testify either as to whether there were guard rails on the scaffolds or as to a prior similar occurrence involving two men; and one Ledbetter who testified about the incident causing plaintiff's injury and to an incident which occurred in the presence of defendant's assistant superintendent Wagner about 2 weeks prior to the subject incident.

Howard L. Sather, an orthopedic surgeon, testified that, having observed plaintiff in the hospital after the accident, he diagnosed the plaintiff's injuries as a compression fracture of the right heel bone and a strain of the lower back. The plaintiff was hospitalized for approximately 2½ weeks, used crutches for 3 to 4 months, and finally underwent surgery in May, 1963, to solidify the injured joints to prevent any movement and thereby eliminate the pain. In January, 1964, approximately 15 months after the accident, the witness recommended that the plaintiff return to some type of light work.

Charles H. Mann, president of defendant corporation, was called by the plaintiff as an adverse witness under section 60 of the Civil Practice Act. In October, 1962, the witness was vice-president of the defendant company and was also its general field superintendent which required him to travel from job to job in a supervisory capacity, inspecting the various jobs as they progressed. Mann stated that the defendant had entered into a contract with AEC and thereby became the general as well as prime contractor for the construction work at Argonne.

A general contractor, Mann testified, is responsible for the work of a subcontractor "insofar as it must agree with the plans and specifications" and it is customary within the building trade for the general contractor or his agent to inspect the work of the subcontractors. With regard to the Argonne job, the witness stated that he visited the site two to three times a week; that stripping had to be performed as part of the overall work; that he had made only a casual inspection of the hanging scaffolds, observing that the lower 4 x 4" cross bars extended from 12 to 18 inches beyond the scaffold hangers; that he had received no information that anyone other than plaintiff had been injured on the scaffolds; and that news of any such injury would come from either defendant's accounting department or a Mr. Meuller, defendant's field superintendent.

Plaintiff's counsel attempted to question Mann regarding health and safety rules and regulations governing the construction industry, but the trial court sustained defense counsel's objection to the question on the

ground that such rules are binding only between an employer and employee.

Plaintiff also requested that two paragraphs from defendant's contract with the AEC be admitted into evidence. One paragraph obligated the defendant to have a full-time superintendent on the work site with authority to act for defendant. This provision, plaintiff argued, would demonstrate to the jury that defendant was obligated by contract to furnish a superintendent. The other paragraph required defendant to take all reasonable precautions to protect the health and safety of employees and the public and to comply with all health, safety, and fire protection regulations and requirements of the AEC. Again plaintiff's counsel maintained that the jury should be aware of defendant's contractual obligations with the AEC in order to determine the extent of defendant's responsibility, *i.e.*, whether it was "in charge of" the job. The trial court sustained defense counsel's objection to the admission of the contractual provisions into evidence since, the court stated, the contract between defendant and the AEC was not relevant.

The trial court later sustained an objection to plaintiff's counsel's question to Mann as to whether defendant's contract with the government required defendant to follow any specific safety regulations and further prevented plaintiff from introducing into evidence industry standards as set out in various manuals since such information was not "germane" considering the number of different trades a general contractor must supervise.

Mann acknowledged that there are "certain customs and practices which are known and accepted in the construction industry relative to the method of construction and erection of scaffolds." He further stated that in Chicago in October, 1962, it was customary on this particular type of scaffold to securely fasten the hanger to the cross bar with a clamp or "U-bolt"; that it was not the custom or practice to provide guard rails or to secure planks so as to prevent slipping; and that it was customary to bridge one scaffold from another by planking.

David J. Brumley, a civil engineer, testified he worked for the AEC until 1965. While in the Commission's employ he had held construction management positions, the last being chief of the project management and construction branch. As such he was associated with the project at Argonne where one of his project engineers followed the work on a daily basis and would report to the witness. The witness stated that he was familiar with the contracts between the government and those erecting the ZGS building; that defendant was the general contractor and, as such, it was "in charge of the construction, erection."

Arnold K. Schrader, a civil engineer, testified on behalf of the plaintiff as an expert witness. The trial court prohibited counsel from questioning the witness regarding industry standards in their printed form, *i.e.*, in a manual but allowed inquiry into the custom and practice of the industry concerning the assembly and use of the type of hanging scaffold involved in the plaintiff's accident.

Explaining the customary method of constructing such a scaffold Schrader stated that, once the plank[s] forming the floor of the scaffold have been placed upon the two lower 4 x 4 cross bars, it

"[I]s spiked into the 4 x 4's, and the hangers abut the planks; and either a pin is put through the 4 x 4 members supporting the plank or a blocking is applied to keep the hangers from shifting out.

\* \* \*

Along with the completion of the platform there should be toe boards to keep things from coming off the stage or as a warning to anybody working on it that this is the edge of the scaffolding.

Also, safety rail should always be put on, on all four corners around the stage."

On cross-examination the witness stated that it is customary in the industry to provide guard rails around scaffolds that are less than 10 feet above the ground and that his knowledge of such industry customs is based upon experience from only three jobs.

On re-direct plaintiff asked Schrader if his knowledge was based on any information other than past experience. Defendant's objection to the question was sustained and plaintiff eventually made an offer of proof of the various industry standards through Schrader who testified that the American Standard Safety Code for Building Construction, the State of Illinois Health and Safety Act, and the Manual of Accident Prevention by the Associated General Contractors Association are all recognized standards within the construction industry. This offer of proof was denied.

Mann, testifying on behalf of the defendant, stated that Richard Wagner (the man mentioned by a number of plaintiff's witnesses) had died before the trial; that clamps or U-bolts are used on the hanging scaffold when the scaffold is used in high places; and that, while he observed the type of scaffolding used to strip, he made no actual inspection of it since he had "a superintendent and various foremen on the job whose business it is to go into the details."

John L. Meuller testified that he had worked as defendant's field superintendent at the construction site of the ZGS building at Argonne; that it was his duty to see that the building was built in accordance

with the plans and specifications; that the AEC was the building's owner and defendant was the general contractor. Over plaintiff's objection Mueller was permitted to testify that, on occasion, the AEC sent representatives to the construction site. Although the witness had occasion to observe the employees of Adjustable working, he stated that no one had spoken to him regarding anything of an unusual nature concerning the scaffolding.

## I.

Plaintiff urges that he was materially prejudiced by the rejection of evidence of two similar prior accidents. We agree.

Once Eligha Tanner had recounted the circumstances of the accident resulting in plaintiff's injury, plaintiff's counsel sought to elicit from the witness testimony concerning prior unusual occurrences involving the same type of scaffold at the same site. Tanner did testify about one instance where he had been standing on a scaffold alone when a piece of plywood flew in the wind and knocked a hanger from beneath the 4-by-4-inch cross bar causing the scaffold to fall from under him. The witness then described two other occasions in which he and one other man were working on the same scaffold and, as they pulled down a piece of plywood from above them, it knocked a hanger from under the cross bar and the scaffold fell.

Pursuant to defense counsel's objection, the trial court struck the testimony of these latter two occurrences, noting that there were two men on this scaffold and therefore altogether different from plaintiff's incident which involved only the plaintiff. As the witness began to describe yet one more incident the court interrupted:

"THE COURT: Were there two men on the scaffold again on this occurrence?

THE WITNESS: Yes, sir.

THE COURT: Same objection. Sustained."

Our reading of the record indicates that the trial court ruled that the testimony of two prior similar occurrences be withheld from the jury's consideration primarily because, at the time of the mishaps, two men rather than one, were standing on the scaffold and also apparently because the board which dislodged the hanger came from above the men rather than being propelled by the wind.

■■ Plaintiff solicited this testimony for the expressed purpose of demonstrating that defendant had prior *notice* of the scaffold's unsafe condition. It is well-established that evidence of prior similar occurrences is relevant for purposes of showing *notice* that it was not a safe, suitable and proper structure for the workmen. *City of Chicago v. Jarvis* (1907),

226 Ill. 614, 617, 80 N.E. 1079; *Matteucci v. High School District No. 208* (1972), 4 Ill.App.3d 710, 716-17, 281 N.E.2d 383; *Moore v. Jewel Tea Co.* (1969), 116 Ill.App.2d 109, 129, 253 N.E.2d 636; *City of Kankakee v. Phipps* (1907), 135 Ill.App. 585, 586.

Defendant points out that the trial court did permit testimony of at least two prior accidents on the scaffold, one involving Tanner alone and the other involving Tanner and Ledbetter. However, in consideration of the significance of the issue of notice, we cannot speculate as to the impact, if any, this additional evidence might have on a jury. And, especially is this important when we consider the totality of the trial errors.

■■ We believe that the crucial factor to determine the relevancy and admissibility of the rejected testimony concerning prior similar occurrences is whether those are reasonably similar. The rejected mishaps occurred on the same type of scaffold as that used by the plaintiff and occurred at the same location, *i.e.*, the ZGS building. These incidents are certainly pertinent to the issue of defendant's knowledge of prior occurrences. Although it is significant that more than one man may have been standing on the scaffold, or that the board which eventually dislodged the hanger came from above or from a neighboring scaffold since, notwithstanding these factors, each prior occurrence was relevant evidence directed to the issue of the same inherent weakness of the particular type of scaffold in question. Accordingly, once the witness testified that the scaffold used in the prior instances was of the same type as that involved in plaintiff's accident and that each mishap occurred in the ZGS building, plaintiff's counsel had established that reasonable similarity exists. In our opinion the trial court's refusal to submit this evidence for the jury's consideration constituted prejudicial error.

## II.

Plaintiff maintains that he was materially and irreparably prejudiced by numerous rulings of the trial court which prevented him from submitting to the jury what he believed to be a quantity of relevant evidence. Plaintiff complains of the trial court's refusal to admit into evidence certain provisions of the contract between the defendant and the AEC and its refusal to permit plaintiff's counsel to question a number of witnesses regarding various industry standards.

During the course of the trial plaintiff's counsel offered into evidence the following provisions of the defendant's contract with the AEC:

"11. Superintendence by Contractor

The Contractor shall give his personal superintendence to the work or have a competent full time superintendent, satisfactory to the

Contracting Officer, on the work site, with authority to act for him.

\* \* \*

29. Safety, Health and Fire Protection

The Contractor shall take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations and requirements \* \* \* of the Commission \* \* \*.

\* \* \*

1—05. Definitions:

\* \* \*

g. Unless otherwise shown or specified, all work shall conform to the applicable portions of the following list of specifications.

\* \* \*

American Standards Association.

\* \* \*

1—19. Scaffolding:

a. Contractor shall provide, erect and remove all scaffolding required by all trades in the execution of the Contract.

b. Scaffolding shall comply in all respects with the best practice of the trades for the protection of existing and current construction.

\* \* \*

1—46. Safety and Fire Protection: Pursuant to General Provisions, Article Safety, Health and Fire Protection, compliance with the following codes and standards shall be considered minimum requirements:

a. American Safety Standards (American Standards Association) including Safety Code for Building Construction, ASA A10.2."

Counsel sought to introduce these various contractual provisions in order to demonstrate that defendant was in charge of the job. Nonetheless, after lengthy discussion outside the presence of the jury, the trial court denied plaintiff's counsel's request to read these provisions to the jury and to question Charles Mann concerning them, reasoning that:

"This Court has taken the position that the Act itself provides the standards and the requirements of liability and duty insofar as the scaffolding is concerned.

This Court takes further the position that this is a contract between the original owner and general contractor, and therefore I believe that all of these matters are not germane insofar as this

proceeding is concerned, and on that ground, I am going to not permit for any admission any of this contract."

■■ It has long been held that the objective of the Act is to provide protection to workers engaged in extrahazardous work. As our supreme court stated in *Louis v. Barenfanger* (1968), 39 Ill.2d 445, 448, 236 N.E.2d 724, "* * * it is well established that a general contractor in control of premises must furnish the employees of sub-contractors a safe place to work. See: 20 ALR2d 873." As previously noted, the pleadings placed in dispute the applicability of the Act to the defendant and also the question of whether the defendant as general contractor was in fact "in charge of that portion of the building or that instrumentality which is alleged to be the cause of plaintiff's injury." The cited provisions of the contract between the defendant-general contractor and the owner certainly have a bearing on the question of "in charge." In our opinion the trial court, by relying upon the provisions of the Act, erred in rejecting this evidence.

The trial court's ruling further indicated that the provisions of defendant's contract with the AEC were not relevant in an action between defendant and its subcontractor's employee. Quite the contrary, as argued by plaintiff's counsel in the court below and in this appeal, these contractual provisions are material to the issues of whether the defendant was "in charge of" construction and whether defendant reasonably should have known if the scaffolding used was unsafe. As stated by this court in *O'Leary v. Siegel* (1970), 120 Ill.App.2d 12, 19, 256 N.E.2d 127:

> "The primary issue is whether, given the legislative intent evinced by the statute, the clauses [of the contract] relate to the question of [the general contractor's] relationship with the job, and whether [the general contractor] could be deemed to have been 'in charge of' the jobsite. The standard for measuring the admissibility of evidence * * * encompasses all rights and duties of the defendant on the job, which do not unduly prejudice his case or cloud the issues, to the end that a proper determination of the relationship may be achieved. * * * The fact that some of the clauses outline defendant's duties to the government in no way detracts from their usefulness in determination of the issues at hand, since the duties of a general contractor to the owner can be determinative of the issue of who was in charge of the jobsite."

In *O'Leary* the defendant general contractor, appealing *inter alia* from a judgment in favor of the plaintiff-employee of its subcontractor, alleged as error the admission into evidence of a number of clauses from the contract between itself and the building owner, the general services administration of the United States government. Thus, in the instant case,

the contractual provisions were relevant to the "in charge" issue and their admission into evidence would not have either unduly prejudiced defendant's case or beclouded the issues.

The trial court further prevented plaintiff from questioning Mann and Schrader regarding various industry standards.

Counsel sought to introduce evidence of industry standards so as to demonstrate the proper method of constructing the particular scaffold in issue. An offer of proof of these standards was made through plaintiff's expert witness, Schrader, who testified that the American Standard Safety Code for Building Construction, the State of Illinois Health and Safety Act, and the Manual of Accident Prevention by the Associated General Contractors Association are all recognized standards within the construction industry. This offer of proof was denied.

■■ We believe the trial court erred in rejecting the proffered evidence of industry standards. As discussed previously, what shall constitute a "safe scaffold" depends upon the particular set of circumstances. The evidence tendered by the plaintiff was certainly relevant to that determination.

In *Able v. Pure Oil Co.* (1972), 8 Ill.App.3d 558, 564, 290 N.E.2d 331 this court recognized that such evidence is proper but declined to pass upon whether the trial court erroneously prevented the plaintiff from eliciting testimony concerning industry standards since the plaintiff made no offer of proof regarding sections of any documents relevant to the witness' testimony.

Although the standards and regulations suggested by plaintiff do not conclusively determine the standard of care, such information aids the jury in deciding what was feasible and what the defendant knew or should have known. *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.2d 326, 332, 211 N.E.2d 253.

Arguably the testimony concerning accepted customs and practices within the industry might have served this purpose and, if such were the case, evidence of formal industry standards would have been merely cumulative. As noted above, both Mann and Schrader testified as to industry custom. Defendant, by the terms of its contract with the AEC, was bound to follow the standards as set out by the American Standards Association. Consequently evidence of industry standards was not merely cumulative and could have been helpful to the jury in determining the extent of defendant's responsibility.

### III.

Plaintiff next contends that the trial court improperly submitted the following instruction to the jury:

"There was in force in the State of Illinois as [*sic*] the time of the occurrence in question, a certain statute titled the Structural Work Act, providing that all scaffolds erected or constructed by any person, firm or corporation in this state for the use in the erection of any building shall be erected and constructed in a safe, suitable and proper manner, and shall be so constructed as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon.

The Structural Work Act further provides that scaffold, or staging, swung or suspended from an overhead support more than twenty (20) feet from the ground or floor shall have, where practicable, a safety rail properly bolted, secured and braced, rising at least thirty-four (34) inches above the floor or main portion of such scaffolding or staging, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure.

The Structural Work Act further provides that any person, firm or corporation having charge of the erection of any building shall comply with all the terms of the Act, and that for any injury to person occasioned by any wilful violations of the Act, a right of action shall accrue to the party injured for any direct damages sustained thereby."

In view of the fact that there had been no testimony that the particular scaffold in question was of a height in excess of 20 feet above the ground, plaintiff's counsel objected to this instruction on the ground that the second paragraph was not supported by any evidence in the record. Plaintiff maintained that the instruction would give rise to a negative inference that the scaffold in question did not need a guardrail. The trial court nonethless disagreed commenting that:

"Paragraph two certainly expresses the intent of the legislature, that in scaffolding over 20 feet from the ground, that these particular items should be provided for, which is the standard set by the legislature as to the safe and proper erection of such a scaffold; no question about it."

It appears that the trial court's statement is premised upon an interpretation of section 1 of the Structural Work Act which provides in pertinent part:

"All scaffolds * * * erected or constructed by any person, firm or corporation in this State for the use in the erection * * * of any * * * building * * * shall be erected and con-

structed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, * * *.

Scaffold[ing] * * * swung or suspended from an overhead support more than twenty (20) feet from the ground or floor shall have, where practicable, a safety rail properly bolted, secured and braced, rising a [at] least thirty-four (34) inches above the floor or main portion of such scaffolding * * *, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure."

While this last paragraph of section 1 imposes particular safety standards for construction of swinging scaffolds suspended more than 20 feet above the ground, it had no application to the instant case since here the evidence clearly established that the scaffold was between five and seven feet above the ground. The first paragraph imposes only a general standard of care and, indeed, the legislature did not attempt to define what shall constitute a "safe scaffold" since such depends upon each particular set of circumstances. *Louis v. Barenfanger* (1968), 39 Ill.2d 445, 449, 236 N.E.2d 724.

Instructions to the jury must be predicated upon evidence in the case and any instruction not based on the evidence should not be given (*Gibson v. Healy Bros. & Co.* (1969), 109 Ill.App.2d 342, 354-55, 248 N.E.2d 771; I.L.P. *Trial* § 233). In the instant case the inclusion of the second paragraph in the instruction could only serve to confuse the jury. By instructing the jury as to the safety requirements set out in paragraph two of section 1 the court informed the jury of a specific statutory standard of care that was not applicable to the facts appearing in the record.

Defendant urges that even if this court concludes that the objectionable paragraph should not have been included in the instruction, its inclusion does not constitute reversible error since the jury was also instructed that all scaffolds must be constructed in a safe and suitable manner and that it could find a wilful violation of the statute only if it found from all the evidence that the scaffold in question was not safe, suitable, or proper. ■■ We disagree with the defendant's position and find that the submission of this instruction to the jury constituted reversible error.

### IV.

Plaintiff also urges that the trial court erred in refusing to direct a

verdict in his favor on the issue of liability as well as the court's denial of plaintiff's motion for judgment notwithstanding the verdict. The errors noted previously in this opinion necessitate a reversal and remand for a new trial. On a re-trial there will be additional evidence presented; therefore, it is unnecessary at this time to discuss this point.

As to other evidentiary errors noted by the plaintiff, we are confident that on a re-trial the trial court will give appropriate consideration to the views expressed herein insofar as they may apply.

For the reasons set out herein the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial consistent with the views expressed herein.

Judgment reversed and remanded.

STAMOS and LEIGHTON, JJ., concur.