ROBERT BISHOP, Plaintiff-Appellee, *v*. LEE CROWTHER *et al.*,
Defendants.—(LEE CROWTHER, Defendant-Appellant.)

First District (1st Division)    No. 79-1852

Opinion filed December 22, 1980.—Rehearing denied January 26, 1981.

John E. Guy and Abramson & Fox, both of Chicago, for appellant.

Anezi, Ozmon, Lewin & Associates, Ltd., of Chicago (Nat P. Ozmon, Curt N. Rodin, and Dario A. Garibaldi, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Robert Bishop, brought an action pursuant to the Structural Work Act (the Act) (Ill. Rev. Stat. 1977, ch. 48, par. 60 *et seq.*) for injuries suffered when he fell from the top of a ladder while carrying shingles to the roof of defendant Lee Crowther's home. The jury returned a verdict against defendant and the circuit court of Cook County entered judgment on the verdict. Defendant appeals, seeking a judgment notwithstanding the verdict or a new trial. He contends that: (1) because plaintiff covenanted not to execute against defendant's personal assets, defendant is not legally responsible for damages; (2) defendant, a private homeowner, is not "in charge of" the work under the Act; (3) plaintiff's testimony constituted a judicial admission that barred his claim; (4) safety standards were improperly admitted into evidence; (5) other trial errors prejudiced him; and (6) the Act, though constitutional when drafted, has become unconstitutional by judicial misinterpretation and misapplication.

Defendant Lee Crowther testified that he had been a roofing and sheet metal contractor since 1955. In 1973 he was well versed in the work that roofers and sheet metal workers perform and was familiar with the customs and practices of that industry. He also had knowledge as to various construction practices, including carpentry. From time to time

Crowther worked as a field superintendent, directing field operations, including journeymen-carpenters, roofers, etc.

In 1973 Crowther decided to build an addition to his home in Joliet. He determined that excavation work was necessary and the size of the addition. Crowther accepted a bid from Kofoid & Tilon, construction contractors, and entered into an oral agreement that they build the single-story family room addition. Kofoid was not to perform the waterproofing, heating, air-conditioning and roofing. Various other contractors were to perform these jobs. Crowther, Inc., of which defendant was a principal or shareholder and vice-president, was to install gutters and shingle the roof. Crowther testified that either someone told him the work was ready for shingles or he observed that it was ready.

Crowther had seen "material hoists" used to transport shingles up to rooftops. Crowther, Inc., does not own a conveyor system to transport shingles to the roof. He didn't think Crowther, Inc., got the bundles of shingles up to the roof.

Crowther further testified that if he were home while work was being done, he would probably call unsafe work practices to the workers' attention. There were days when Crowther was at the work site during daytime hours while different tradesmen were there. He stated that he probably possessed far greater knowledge of the construction industry than the average homeowner. Crowther admitted that unlike the average homeowner he coordinated the work between Kofoid and Crowther, Inc. He paid Kofoid "progress payments" by personal check and made sure Kofoid had performed the amount of work represented. As owner of the house, Crowther had the authority to stop the work of Kofoid if it was being done in an unsafe manner. Crowther believed he had particular or unique knowledge compared to an average homeowner of what an unsafe condition would be. He also had the right to schedule the work of the various contractors.

On the date of the accident, the shingles were supposed to be on the job site on the roof when plaintiff arrived. However, there were not enough shingles. The ground at the job site was uneven, but Crowther did not recall if it was muddy. The perimeter area of the addition had experienced settling of backfill, forming a trench. The backfill had to be redone so the ground was not so uneven. Crowther testified that he has seen times where workmen had to place ladders on muddy, bumpy areas. However, if a man working for Crowther, Inc., placed a ladder against new gutters and climbed the ladder with an 85-pound bundle of shingles, Crowther would have fired him.

Crowther admitted that he was not on the job site as a Crowther, Inc., superintendent, but as owner of the house. During the course of the construction, he had conversations about the work with Carl Kofoid and

probably his partner. Defendant made specific recommendations about the work. Crowther also testified that the general contractor has the responsibility of job safety. He was familiar with OSHA (Occupational Safety & Health Administration) laws.

Frank Budzinski testified that on December 12, 1973, he was a journeyman carpenter working on Crowther's home. He was an employee of Kofoid. Budzinski considered either Mr. Crowther or Mr. Kofoid to be the general contractor and took orders from whichever man was present. Both men were basically "overseeing the job." Lee Crowther ran the job on the days he was present and gave specific orders. On the day of the accident, the new gutters were up. Backfilling had been performed and had settled. Budzinski did not witness the accident, but saw plaintiff lying on the ground with his legs entangled in the ladder.

Carl Kofoid, partner of Kofoid & Tilon, testified that it is unusual for a homeowner to schedule the work. The general contractor usually schedules the work and coordinates the work between the trades. Crowther scheduled some of the work and coordinated some of the work. It was assumed that Crowther would handle his areas of specialization (sheet metal, heating and roofing) and Kofoid would handle his. Kofoid believed that the general contractor is responsible for job safety. The same safety considerations apply to the construction of a single-family house addition as on a large construction project.

From time to time Crowther and Kofoid walked around the job site and discussed the work finished and the work to be done. They discussed work progress more than once a week. According to Kofoid, both men were functioning as general contractors.

Charles Schulz testified that he was a construction safety consultant employed by the State of Illinois. He was experienced in safety requirements applicable to all types of construction, including small construction. There is no difference between the safety rules and regulations applicable to a small or large job. Standards pertaining to the use of ladders are equally applicable to small and large construction sites. Schulz was familiar with the general customs and practices of the construction industry in the Joliet area in 1973. These customs and practices concerning the placement and erection of ladders are exemplified by various written standards which state:

"[1] * * * Ladder feet shall be placed on a substantial level base, and the area in the vicinity of the bottom should be kept clear. Both the top and the bottom of the ladder should be secured to prevent displacement. Use ladder shoes, stakes, or other means of securing.

In ascending or descending ladders workmen should test the ladder and use both hands to hold onto side rails. If material must

be moved from one level to another, a rope, block and tackle, or other means should be used. Materials should not be hand carried on ladders.

[2] Footing support: The ladder base section must be placed with a secure footing on a firm level base. Ladder level boards may be used for this purpose. Safety shoes of this substantial design shall be installed on all ladders. Where ladders with no safety shoes or spikes are used, a foot ladder board or similar device should be employed. Do not use ladders on ice, snow or slippery surfaces unless suitable means to prevent slipping are employed.

[3] Portable ladders shall be placed on a substantial base and the area around the top and the bottom of the ladder shall be kept clear.

Portable ladders in use shall be tied, blocked or otherwise secured to prevent their being displaced."

Schulz was asked a hypothetical question setting forth the pertinent facts of the case. He answered that the ladder was not placed upon a safe foundation or properly secured. It did not comply with the standards regarding safe placement of ladders and was not properly tied in. In his opinion, the ladder should have been placed on a "mud sill," which is either a scaffold plank or a piece of plyboard that the ladder feet can rest on without being displaced. Standard safety shoes are not sufficient to prevent the ladder from slipping in mud. Schulz also believed that the ladder should have been secured at the top. In short, placing the ladder in mud constituted an unsafe practice that was exacerbated by carrying the 85-pound bale of shingles to the roof.

William Grant Bishop, plaintiff's brother, testified that on December 12, 1973, he worked for Birsa Remodelers and Crowther, Inc. On December 11, 1973, Tom Birsa instructed the Bishop brothers to go to defendant's home and work for him. At the job site they had a conversation with defendant. Crowther introduced them to Frank, the foreman, and said, "* * *if anything came up, if we needed anything and he wasn't there, to see him."

The day before the accident, the gutters were not up and the Bishops had no difficulty placing the ladder on the east side of the house. The shingles they were to install were already on the roof. However, they ran out of material and called defendant for more. Crowther told Bishop to pick some up and charge it to him. On December 12, at the job site, Bishop noticed that the gutters had been installed on the east side of the roof.

William Bishop further testified: His brother (plaintiff) placed the ladder at the north end of the house. He (William) walked over to the

ladder to talk to Frank, who was already there looking at it. It is customary not to place ladders against new gutters because it would damage them. There were no gutters along the north side; the ground along the north side where the ladder was placed was rough, unlevel; it was frozen and it was a little melting, maybe snow or frost and muddy. The ground along the east side in front of the bay window (where the ladder had been the previous day) was much more level and not as muddy as on the north side. Then he saw the bottom of the ladder sliding out in the mud. His brother was on the ground and "was right on the edge of the excavation, sort of like he was falling into the ditch and the ladder was sort of on top of him, tangled in his feet." The ladder was perpendicular to the house. He saw the tracks that the ladder had made sliding in the mud, like two sled runners. Frank came back from around the corner and helped William take the bundle of shingles off his brother. About five minutes later, Lee Crowther came over. The ladder was not tied off on top and there was no type of bracing under the ladder. The Bishops didn't have any planking to place under the ladder.

William Bishop dealt solely with Crowther concerning the job. Tom Birsa only directed the Bishops to report to Lee Crowther. Bishop knew both Scott and Mike Crowther, but dealt only with defendant. William Bishop testified that the ladder was placed in 1 to 1½ inches of mud, which was on top of frozen ground.

Plaintiff, Robert Bishop, testified that on December 12, 1973, he was a carpenter employed by Birsa Builders. He was told to go out to defendant's home the afternoon of December 11. There were shingles up on the roof and plaintiff placed his ladder on the east side of the addition. No gutters were up. The ground was the best location for the ladder because the ground was smoother. They didn't finish shingling that day because they ran out of shingles.

On December 12, 1973, plaintiff and his brother returned and noticed that gutters had been installed. Plaintiff placed the ladder on the north side of the addition because he couldn't place it against the new gutters as it would have damaged them. The ground along the north side of the addition was bumpy and muddy and the excavation hole was still there. Plaintiff placed the ladder in the best available spot where he believed it was "reasonably safe." He tested the ladder with his hands and then proceeded up the ladder with an 85-pound bundle of shingles. No one was holding the ladder. While he had his left foot on the edge of the roof and his right foot on the ladder, the ladder slipped out. Plaintiff fell down partially in the excavation hole (which was about three feet from the addition and three feet deep). He tried to throw the shingles off his shoulders as he was falling, but they landed on his hip. No one witnessed

the accident. Defendant returned to the job site about five minutes after the accident.

Plaintiff further testified that there were no stand-offs for the ladder available in the truck. Also, there was no place to tie off the ladder on the roof without damaging the gutters or other material. He stated that he had a conversation with defendant on December 11, during which defendant gave them specific instructions about the shingling. Plaintiff stated that defendant was running the roofing portion of the job.

Based on this evidence, the jury returned a verdict against defendant Crowther. He raises three major assertions on appeal: (1) lack of damages as a matter of law because of the covenant not to execute; (2) trial errors; and (3) the unconstitutionality of the Act.

Plaintiff and defendant entered into a covenant providing that plaintiff would not seek to execute any judgment against any personal assets of defendant, but reserved the right to execute against assets relating to his insurance. Crowther asserts that a legal consequence of this covenant is that no damages are enforceable against him individually. He further maintains that plaintiff failed to establish an element of his cause of action: proof of damages. We disagree. Defendant's argument fails to distinguish between such concepts as liability, damages, judgment and execution. Defendant's liability and the amount of damages were both established by the judgment. The execution determines which of defendant's assets will be used to satisfy the judgment. An agreement limiting execution to specific assets does not negate damages.

■■ *Thornton v. Paul* (1977), 51 Ill. App. 3d 337, 366 N.E.2d 1048, *aff'd in part, rev'd in part on other grounds* (1978), 74 Ill. 2d 132, 384 N.E.2d 335, involved a similar covenant. *Thornton* concerned a tavern owner striking a patron with a club. The insurer refused to defend the civil suit because its policy excluded intentional torts. Plaintiff and defendant entered into an agreement in which plaintiff agreed to limit the source of collection of any judgment to defendant's insurer. This agreement was not disclosed to either the court or the insurance company until after a default judgment was entered and garnishment proceedings instituted against the insurer. The insurer filed a section 72 petition to vacate the default based upon the undisclosed covenant. The appellate court denied the petition, stating (51 Ill. App. 3d 337, 341):

> "An agreement per se between the claimant and the insured where the carrier is denying coverage, stipulating that the plaintiff will not execute against property of the insured other than the limits of the insurance policy in the event of a recovery against defendants in the principal action, has been approved and is not contrary to public policy. *Krutsinger v. Illinois Casualty Co.* (1957), 10 Ill. 2d 518, 141 N.E.2d 16; *Maryland Casualty Co. v.*

*Peppers* (1976), 64 Ill. 2d 187, 355 N.E.2d 24; *Elas* [(1976), 39 Ill. App. 3d 944, 352 N.E.2d 60]."

The court also noted that the covenant merely exempted from execution certain of defendant's assets and was not relevant to the question of either liability or damages. Accordingly, we reject defendant's argument that damages were not established.

Crowther next argues that various trial errors, singularly or in combination, prejudiced him. First, he contends that he was not "in charge of" the work because a private homeowner is not liable under the Act.

■■ Generally, the issue of who is in charge of the work is a fact question for the jury. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) The leading case interpreting the term "having charge" is *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247. *Larson* rejected the requirement that supervision and control was essential to having charge of the work. Rather, the court stressed the numerous and diverse factors which showed a connection of authority or an obligation of overall responsibility for the work (33 Ill. 2d 316, 321-22):

> "The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould*, 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a *sine qua non* for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure."

■■ Mere ownership is insufficient to impose responsibility (*Gannon*), and review requires an assessment of the totality of the circumstances. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403.) Moreover, having charge is determined not only from contractual obligation but also from the surrounding circum-

stances and the role one assumes. *Fruzyna v. Walter C. Carlson Associates, Inc.* (1979), 78 Ill. App. 3d 1050, 398 N.E.2d 60, *appeal denied* (1980), 79 Ill. 2d 631.

Various factors are probative of having charge, including but not limited to: (1) ownership of equipment used at the job site (*Winter v. Davis* (1980), 85 Ill. App. 3d 912, 407 N.E.2d 696); (2) the right to stop work or terminate employment (*Fruzyna*); (3) familiarity with construction methods and the cause of the injury (*Norton v. Waggoner*); (4) supervision or control of the work or retention of the right to do so (*Larson v. Commonwealth Edison*); (5) participation in ongoing activities at the work site (*Warren v. Meeker* (1973), 55 Ill. 2d 108, 302 N.E.2d 54); (6) responsibility for employee safety (*Pantaleo v. Gamm* (1969), 106 Ill. App. 2d 116, 245 N.E.2d 618); and (7) inspections and other activities at the job site. *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348.

Crowther admitted that he worked in the construction industry all his life and was familiar with construction customs and practices. He was well versed in roofing work. Crowther had an architect prepare exterior elevation and window location plans. He inquired about prices from three different construction companies. He assigned a portion of the work to Kofoid & Tilon and another portion to Crowther, Inc. Crowther determined when the work was ready for shingles and determined how many shingles to order. Moreover, Crowther was present when tradesmen were at the work site. He was familiar with OSHA regulations and would or could have called safety violations to the attention of the workers.

Crowther coordinated the work between Kofoid & Tilon and Crowther, Inc. He admitted that he had greater knowledge of the construction industry and safety aspects of the industry than did the average homeowner. He determined the amount of "progress" payments to make. Crowther was present on the job site as an owner and not as an employee of Crowther, Inc. He had the authority to stop the work of Kofoid and Crowther, Inc., if it was being done in an unsafe manner. He had the right to schedule the work of the various contractors. Crowther also could call the number one man at Kofoid and tell him how to instruct his employees.

Other witnesses testified that defendant was the general contractor; that he personally gave orders to workmen on the job. Crowther "oversaw" the job, scheduled the work, ran the job when present, and coordinated the various contractors. Crowther performed the duties of general contractor and coordinator personally and not as an employee of Crowther, Inc. As general contractor, he was responsible for job safety. It was his decision whether or not Kofoid should redo the backfill to even it off.

Crowther discussed the progress of the work with Kofoid more than once a week. He discussed the job with William Bishop. He told Bishop where specifically to install certain shingles. Crowther instructed plaintiff to put metal around the edges of the roof. Defendant himself was "running the roofing" aspect of the job.

■■ This record reflects ample evidence to support the jury determination that Crowther was in charge of the work. Although, in most instances, a homeowner would do nothing more than hire an independent contractor to do the work, the typical homeowner would not normally possess the high degree of knowledge of the construction industry demonstrated by Crowther. He implemented this knowledge and interjected himself into the progress and completion of the work. In short, defendant was not liable because of mere ownership, but because of his supervision and control of the work. Accordingly, we will not disturb the jury's finding on this factual issue.

Defendant next argues that the trial court erred because the legal meanings of certain terms were not explained to the jurors and because the "common, ordinary" meanings imputed to terms by the jury were not explained to the court and counsel. Defendant made motions in limine and objections at trial and during the conference on instructions pertaining to the terms "in charge of," "wilful," "inspect," "coordinate," "order changes," "stop the work." Our review of the record has not demonstrated any inappropriate use of these terms. Moreover, defendant has failed to furnish any authority indicating how any use of these terms was inappropriate or prejudicial.

■■ Specifically, defendant finds fault with the trial court's following the Committee's suggestion in connection with IPI Civil No. 180.16 (2d ed. 1971) that, because of the holding in *Larson*, no instruction should be given on the meaning of "in charge of" in a Structural Work Act case. The trial court committed no error in this regard. *Larson v. Commonwealth Edison.*

■ Second, defendant contests the meaning of the term "wilful" and asserts that the word cannot be synonymous with "knowing." He also attacks IPI Civil No. 180.14 (2d ed. 1971), which defines a wilful violation of the Act. Use of this term and the instructions provided were consistent with well-established Illinois law. Defendant's arguments to change that law are inappropriate in this forum.

■■ Finally, defendant argues that on voir dire the jury should have explained the "common, ordinary" meaning of various terms to the court and counsel. Supreme Court Rule 234 (Ill. Rev. Stat. 1977, ch. 110A, par. 234) states:

> "The court shall conduct the voir dire examination of prospective jurors by putting to them questions it thinks appropriate

touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions."

Defendant's "suggestion" would directly contravene this supreme court rule.

■■ Defendant's next contention is that plaintiff established a wilful violation of the Act only through the "dual capacity doctrine" explained in *Marcus v. Green* (1973), 13 Ill. App. 3d 699, 300 N.E.2d 512. He asserts that plaintiff convinced the jury to assume that Crowther's dual ownership of his company and home somehow caused imputed knowledge of the violation from plaintiff into Crowther, Inc., vertically to its officers and then laterally to Crowther as an officer and homeowner. Defendant, however, is not insulated from liability because he owned stock in or was an officer of Crowther, Inc. Crowther's liability was not derivative but direct, stemming from his own conduct and actions and not those of Crowther, Inc. Crowther testified that he was acting in his individual capacity in this venture. This testimony was corroborated by other witnesses. Defendant's corporate position has no relevance in light of these admissions.

Defendant next argues that plaintiff barred his claim through testimonial judicial admissions. Specifically, defendant asserts that plaintiff testified establishing a judicial admission that the Act was not violated by unequivocally admitting that the ladder was safe and suitably and properly placed.

Judicial admissions are conclusive and may not be contradicted. They may be: (1) those made in pleadings or other documents, or (2) testimonial. (*Huber v. Black & White Cab Co.* (1958), 18 Ill. App. 2d 186, 151 N.E.2d 641.) A testimonial judicial admission is one within the particular knowledge of the witness (*Huber*) and, if the testimony is deliberate, clear and unequivocal as to facts within the party's peculiar knowledge, he will be held to such testimony as a judicial admission. *Welsh v. Centa* (1966), 75 Ill. App. 2d 305, 221 N.E.2d 106.

We find no judicial admission. Plaintiff testified that when he first placed the ladder and before he climbed it, "it seemed reasonably safe at that spot." He also testified that the ladder appeared to him to be safe when he put it in place and that the ladder was on the most level spot he could find. However, he also admitted that the ground along the north side of the addition (where he placed the ladder the day of the accident) was bumpy and muddy and that the excavation hole was still there.

■■ Plaintiff's testimony amounts to no more than his opinion that the ladder was reasonably safe under the circumstances. His subjective indi-

vidual opinion is not a "concrete fact" or admission as argued by defendant. As the trial court noted, a ladder may appear secure when weight is placed on the first rung, but when plaintiff carried an increased weight (85 pounds) upward, past center, the physical forces alter. Additionally, the ground was frozen yet topped with mud, bumpy, unlevel and the ladder was placed within inches of a three-foot-deep trench. Under these circumstances, we believe plaintiff's opinion was properly submitted to and discounted by the jury.

Defendant also objects to the admission of various safety standards into evidence. Charles Schulz testified as an expert witness for plaintiff. In his testimony, he referred to various standards, such as the Occupational Safety & Health Administration Standards (OSHA), the Manual of Accident Prevention in Construction, prepared by the Associated General Contractors of America, and the American National Safety Requirements. He testified in detail how these standards were applicable to the ladder plaintiff used and why they were relevant to the cause of the accident. In Schulz' opinion, "mudsills" should have been used to prevent slipping. He also testified that in the Joliet area there was frequent deviation from the standards. However, there was no evidence that these standards were never followed, as defendant suggests. Defendant fully cross-examined Schulz, but offered no experts to contradict him.

■■ The jury was advised that the expert testimony relevant to the standards manuals did not necessarily represent custom and usage in Joliet in 1973, but that they could still consider the standards. With the admission of the standards pursuant to this liability instruction, we are in accord.

In *Grant v. Joseph J. Duffy Co.* (1974), 20 Ill. App. 3d 669, 314 N.E.2d 478, the court ruled that the trial court erred in rejecting evidence of industry standards. What constitutes a "safe scaffold" depends on the circumstances of the case and industry standards are relevant to that determination. Although standards do not conclusively determine the standard of care, they aid the jury in determining what were feasible practices and what defendant knew or should have known. What weight to afford the standards in a particular case must be determined by the trier of fact.

Moreover, it is not a defense that safety standards were often ignored in Joliet. This evidence further demonstrates a violation of the Act, for custom is not always a full measure of defendant's duty. A geographic area cannot serve to insulate defendant from liability by deviation from safety standards. (See *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *Clements v. Schless Construction Co.* (1967), 91 Ill. App. 2d 19, 234 N.E.2d 578.) Accordingly, under the limiting instruction given by the court, the standards were properly admitted into evidence.

Next, although not specifically raised as a point in argument, defendant intimates in his brief that he did not "wilfully" violate the Act. Our supreme court has interpreted the term "wilful" to mean "knowing." (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) Defendant is considered to know what he reasonably could have known. *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.

■■ There is ample evidence supporting the jury's finding that defendant reasonably could have known about violations of the Act. Crowther admitted expertise and experience in the construction industry, particularly in roofing. He served as the general contractor of the project, was responsible for safety, and was present on the job site when workers were there. Moreover, he coordinated the timing of the work. This included the decision to install new gutters necessitating plaintiff to place his ladder on the north side of the addition. He had the authority to control the timing of backfilling and could have assured that the ground was level and not muddy. Defendant knew or should have known about the ground conditions there: frozen ground covered with mud, backfill, bumpy unlevel areas and the excavation trench. Experienced as he was, defendant also knew or should have known that the workers could not secure the ladder to the roof without damaging the gutters or other newly installed building materials. Crowther failed to supply "mudsills," "stand-offs," hoists for the shingles or any other devices to secure the ladder.

■■ Finally, defendant argues that the Act is unconstitutional. In essence, his objections are twofold: (1) the Act cannot be constitutionally applied to interpret "wilful" as "knowing or reasonably should have known" and (2) the Act has been so misinterpreted and misconstrued as to render it vague, indefinite and uncertain. In *Kennerly v. Shell Oil Co.* (1958), 13 Ill. 2d 431, 150 N.E.2d 134, the supreme court refused to depart from its definition of "wilful" and reiterated that definition in *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 338 N.E.2d 868. Additionally, defendant's claim that the judiciary's interpretations of the Act are contrary to legislative intent is without merit in light of the fact that our legislature has reconsidered the Act on numerous occasions, yet has never altered the interpretations complained of by defendant. *People v. Hairston* (1970), 46 Ill. 2d 348, 353, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

For all the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.