ROBIN LEE COPPES NEWTON, a Minor, by Robert O. Coppes, her Father and Next Friend, Plaintiff-Appellee, *v.* HERBERT MEISSNER *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 78-556

Opinion filed September 4, 1979.

Sam L. Miller, Ltd., of Chicago (Sam L. Miller, of counsel), for appellants.

Maddux, Johnson & Cusack, of Chicago (Philip J. Rock, of counsel), for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:
Plaintiff, Robin Lee Coppes Newton, in a negligence action in the circuit court of Cook County, sought damages for injuries she sustained when struck by an automobile driven by defendant Herbert Meissner as she crossed a highway under construction by defendant Englehardt, Inc. The jury returned an $80,000 verdict against both defendants and answered a special interrogatory finding plaintiff not guilty of contributory negligence. After denying both defendants' motions for judgment notwithstanding the verdict and for a new trial, the trial court entered judgment on the verdict.

Although both defendants filed notices of appeal, only defendant Engelhardt submitted briefs. However, this court granted defendant Meissner's motion allowing him to adopt Engelhardt's brief and reply brief as his own. The issues raised on appeal are (1) whether judgment notwithstanding the verdict or in the alternative whether a new trial should be granted in favor of defendant Englehardt; (2) whether plaintiff was guilty of contributory negligence as a matter of law; (3) whether evidence of a prior accident was properly admitted; (4) whether the trial court erred in giving plaintiff's instruction on negligence; and (5) whether the testimony of a certain defense witness was properly excluded.

The accident occurred on September 6, 1971, Labor Day, at approximately 1 p.m. on Cicero Avenue between 152nd Street and 153rd Street in Oak Forest, Illinois. Cicero Avenue, which runs in a north-south direction, is normally a four-lane highway. About one month before the accident, defendant Engelhardt began reconstructing the two lanes on the east side of Cicero, and traffic was condensed into the two lanes on the west side of Cicero which were converted into one northbound and one southbound lane.

Officers Keller and Lexow, the investigating officers, testified that

they found the plaintiff lying near the center line of the northbound lane of Cicero Avenue about 150' south of 152nd Street. They explained that 152nd Street was not a through street continuing west of Cicero, but formed a "T" intersection with Cicero on its east side. They stated that there was a stop sign for traffic on 152nd Street but not for traffic on Cicero, and that there were no marked crosswalks at this intersection. Officer Keller testified that the closest traffic control signals regulating traffic on Cicero were located at 149th Street and 157th Street.

The officers testified that defendant Meissner's car was stopped in the middle of the northbound lane about 18'11" behind the plaintiff and skid marks from the defendant's automobile measured 70'6". Officer Lexow explained that the length of these skid marks indicated that defendant's automobile was traveling between 39 and 46 m.p.h. Officer Lexow also testified that at the time of the accident the 35 m.p.h. speed limit along Cicero had not been reduced; that due to the construction some of the 35 m.p.h. speed limit signs had been taken down and mounted on telephone poles and temporary posts; and that signs indicating highway construction were posted at 149th Street and 157th Street. On cross-examination, Officer Lexow stated that Cicero Avenue was a State highway and that the city of Oak Forest could not change the speed limit on Cicero without first petitioning the State for permission since the State was in charge of setting the speed limit and posting and maintaining the signs.

Both officers testified that there were two types of barricades in the construction area, one type was 3' high with blinking markers, and the other type was about 5' high, 8' long. They said that the latter type of barricades were placed parallel to Cicero running along its east edge to prevent cars from falling into the excavation area. Officer Lexow testified that these barricades extended the length of the construction area and also that he noticed piles of dirt but could not testify to their exact locations.

Officer Keller testified that there was a rise or a hill about two blocks south of where plaintiff had been standing. He stated that a person would have to step onto the highway past the barricades in order to view traffic. Since the northbound lane was about 14'5" wide, as opposed to the normal 10' to 12 ' wide traffic lane, he stated that it would be possible to stand on the highway in front of the barricades and still not be in the way of traffic. Officer Lexow similarly testified that in order for one to see 150' to the south, it was necessary to stand on the highway beyond the barricades, and since the northbound lane was 14' as opposed to the standard 10' lane, it would be possible to do so without being in the way of traffic. Officer Keller testified that at the point where the defendant's car was stopped on the road, there was a barricade to the east of the car's front bumper but he could not remember which type of barricade it was.

Pamela Sullivan Rasmussen testified that on the day of the accident, after she and plaintiff had eaten lunch at the A&W restaurant located on the east side of Cicero, they intended to go to the bowling alley which was located directly across from the A&W on the west side of Cicero. The east side of Cicero was under construction and there were paths to get into driveways. She said between each driveway next to the pavement of the road were 5′ high mounds of dirt; "horse-type" barricades were placed in the dirt near every driveway; and larger barricades about 5′7″ were placed on the east edge of the road's pavement, parallel to and all along Cicero. She said both she and plaintiff were 5′ tall at the time of the accident.

She stated that when she and the plaintiff left the A&W, they walked out onto the driveway path, but that her view of a northbound car was obstructed by a mound of dirt and she had to stand on the highway past the barricades in order to view the traffic. She said that she and plaintiff stood about 1/2′ out onto the paved portion of the road and watched traffic for about 15 minutes. She then stepped out far enough past the barricades and saw a white car coming over the hill to the south about a block away. Not seeing any traffic behind the white car, she said, "after this car we can go." She stated that after the white car passed they waited about two minutes before crossing. During this time she said they again looked north and south, checked to see if traffic was coming around the corners at 152nd Street and 153rd Street or from the business parking lots, and after agreeing with plaintiff that it looked clear, the two proceeded to walk across the street. She said that she stepped out about 1½′ with the plaintiff when she decided to step back off the street in order to check the time by a clock hanging in the A&W restaurant. After doing so, she stepped back onto the pavement and then saw plaintiff, who was almost to the center line, get hit by a car.

Kathleen Ann Sullivan, Pamela's mother, testified that she lived on the west side of Cicero and worked at a restaurant located on the southeast corner of 153rd Street and Cicero. In order to get to work she said she would walk down the west side of Cicero because there were no barricades on that side of the street and cross at 153rd Street. She stated there were no lights, stop signs, or marked crosswalks at 153rd Street and Cicero. She stated that the east side of Cicero was dug up and the pavement was placed in piles up and down that side of the road. When asked where she would usually cross Cicero, she answered that it depended on where she wanted to go. If she wanted to go to the store, she would cross at a point partially in between the bowling alley and the A&W where there was an opening. She stated there were barricades along the east side of Cicero which came up to her shoulders. She stated

that she was 5'1" tall and that it was necessary for her to step out onto the road before she crossed since she could not see over the barricades.

The plaintiff called Lester Kolom, a road construction expert, who testified to administrative regulations having to do with road construction and the safety of vehicular and pedestrian traffic. He stated that at the time of the accident, the vicinity between 147th Street and 159th Street on Cicero Avenue had an average daily traffic volume count of between 13,000 and 14,000 vehicles. He stated that the construction site as it existed at the time of the accident was a high risk area and presented an extremely hazardous situation. Kolom said a contractor has a duty to see that all sign signals and markings are in place, which in a high risk area would include signs warning of construction ahead, reduction in the speed limit, and there should be no visibility obstructions. He stated that the standard barricade height was 4', and the placement and size of the barricades and the presence of dirt piles in the instant case were violations of the General Contractor Standards. He stated that considering the restricted roadway, the construction, the presence of barricades parrallel to the road which in themselves presented visibility obstructions, and the high traffic count in the instant case, the speed limit should have been reduced to 20 m.p.h.

Defendant Meissner, called by plaintiff as an adverse witness, testified that he first saw plaintiff when he was about 150' to 200' south of her as he was driving north on Cicero at a speed of 35 m.p.h. He said plaintiff was standing next to, but not beyond, a barricade on the east side of Cicero. He recalled barricades being present all along the road and stated that he saw plaintiff through the slits of the barricade. Defendant Meissner testified that when he was about 40' to 60' away, plaintiff stepped out onto the highway, and as soon as he saw her walk past the barricade he began to brake. He said plaintiff had taken about three or four steps before he hit her and there was an indentation slightly to the right of the front center of his car which was caused by the impact with plaintiff's body. He stated that he did not sound his horn, nor veer to the left or right before the impact.

In his deposition, defendant Meissner had stated that on the day of the accident the speed limit in the area where the accident occurred was 45 m.p.h. At trial he explained that this was the speed limit before the construction began, and that he did not see any posted speed limit signs on the day of the accident nor on two other occasions prior to the accident when he had driven through the area under construction. He also did not recall seeing signs warning him that the road was narrowing, or to reduce his speed, although he said he did decrease his speed in the construction area. This was contrary to his deposition testimony where he stated that

he did not decrease his speed when he entered the construction area. On examination by his own attorney, defendant Meissner stated that as he approached from the south he could see above the barricades plaintiff's head down to just below her shoulders and stated that plaintiff continually looked in a northwest direction.

Plaintiff testified that she could not remember the facts of the accident and explained that the account she gave at her deposition was based on things other people like her parents and friends had told her about the accident. On cross-examination, the defense attorneys read statements from the plaintiff's deposition wherein she testified that she left the A&W with her friend, Pam, and while walking on the driveway in front of the A&W to Cicero, she had an unobstructed view to the left and the right; that when she reached the edge of Cicero she again looked to her left and saw a car on the hilltop and told her friend they could cross as soon as it passed; that as the car neared, it veered in her direction at which time she pushed her friend out of the way and then was hit; and that she began to remember how the accident occurred about six months after she returned home from the hospital, in that things started coming back to her "in dreams and things like that." Plaintiff stated at trial that she did not recall making any of these statements and only vaguely remembered being present at the deposition. Plaintiff testified that she did not tell her attorneys that she had no independent recollection of the accident until sometime after her deposition had been taken but could not remember exactly how long afterward. The plaintiff rested and both defendants made motions for a directed verdict which the trial court denied.

Defendants called Dennis Parker who witnessed the accident after coming out of a bowling alley located on the west side of Cicero directly across the street from the A&W. He said he saw the plaintiff standing with another girl on the east side of Cicero. He said both girls started across the street but the one girl stopped, backed off, and hollered "look out." He then saw plaintiff run in front of defendant's car which he said was traveling 30 to 35 m.p.h. He said when entering the construction area there was a sign indicating construction and the speed limit to be 30 or 35 m.p.h. He stated that there were waist-high horse-type barricades along the edge of the road and taller barricades by the driveways, and that he saw only small piles of dirt.

Edward Kolton, a civil engineer employed by the State of Illinois Department of Transportation, testified he was the resident engineer at the construction site at the time of the accident. He explained that a resident engineer was one who represented the State at a construction site and made sure the job was being done according to State specifications and standards. He said the contract between the State and the contractor includes provisions for the type of signs and barricades which are to be

erected at the site. He stated that normally according to the standards, signs warning of the construction are posted, barricades 30″ high are erected every 100′ throughout the construction area to show people where they should and should not travel, and larger barricades are placed at the beginning of the work site and at entering side streets in order to prevent one from driving directly into the construction site. He stated that barricades were set up in this manner at the time of the accident, and he did not recall piles of dirt alongside the road. He stated that prior to the construction work, the speed limit on Cicero was 35 m.p.h. and was not reduced when the construction work first began. He said neither he nor the general contractor had the authority to change the speed limit, only the Bureau of Traffic Department could.

On cross-examination, Kolton stated that the contractor has the responsibility of barricading the area according to the standards and could request the Bureau of Traffic to change the speed limit. He stated that a few weeks after the accident the speed limit was reduced to 25 m.p.h. He also stated that according to standards, excavated materials could not be deposited at an elevation higher than that of the adjacent roadway.

Wayne Zielsdorf, employed by defendant Englehardt at the time of the accident as a dirt foreman, testified that there were dirt piles present in back of the excavation area but not close to the road.

Raymond Henry Christensen testified that he operated heavy equipment for defendant Engelhardt at the time of the accident; that when pavement was dug up it was loaded into a truck and taken to a dump; and that there were no dirt piles 5′ high present along the edge of Cicero. Both Zielsdorf and Christensen stated that the larger barricades were not used on the edge of Cicero but only the smaller "horses" were placed there, and neither of them knew the instant accident had occurred until shortly before the trial.

Ruben Melesio testified that he worked for a company that manufactured, rented, and sold traffic protection equipment, and at the time of the accident his company rented barricades to defendant Engelhardt but could not say what type. He stated that he visited the construction site on September 1, 1971, and saw the smaller "horse-type" barricades 39″ high alongside the road and the larger barricades were off the side of the road.

## I.

Defendant Engelhardt first contends that a judgment notwithstanding the verdict should be entered in its favor because no evidence was presented which showed that plaintiff's injuries were caused by Engelhardt's negligence.

Under the *Pedrick* rule, a judgment notwithstanding the verdict should be entered only when all the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that a contrary verdict could never stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Where there exists a substantial factual dispute, or where the assessment of a witness's credibility and the election between conflicting evidence may be decisive, a judgment notwithstanding the verdict is inappropriate. *Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 909, 337 N.E.2d 403.

Plaintiff alleged defendant Engelhardt was negligent in failing to post a speed reduction sign, in failing to post any warning or other sign so as to protect pedestrians while construction work was in progress, allowed piles of excavated material to accumulate near the roadway and constructed a barricade so as to cause obstructions to the view of pedestrians crossing the roadway.

The evidence when viewed most favorably to the plaintiff indicated that Cicero Avenue in the area in which the accident occurred was populated by residential and business properties. The east two lanes of Cicero were torn up and wooden barricades, at least 5' high, were placed parallel to Cicero on the east edge of its pavement forming a wall along the construction area. Openings in this wall of barricades in the form of dirt-filled paths were periodically made to allow access to driveways leading to the properties. Piles of dirt 5' high were present in these paths near the edge of the road. One wishing to cross from the east side of Cicero to its west side would have to step out onto the highway past the barricades in order to view oncoming traffic. The 35 m.p.h. speed limit in the area had not been reduced at the time of the accident. Defendant Meissner testified that he did not see any speed limit signs in the area. Plaintiff's expert witness testified to accepted standards in the construction industry and said that a contractor has a duty to place all traffic sign signals and markings in place; that the area in question was a high risk area; that because of the high volume count, restricted roadway, the construction, and the presence of barricades, the speed limit should have been reduced to 20 m.p.h. He stated that the barricades exceeded the 4' high acceptable standard and were positioned in such a way as to cause visibility obstructions. He also testified that a contractor has a duty to safeguard the public, and the area as it existed on the day of the accident presented an extremely hazardous situation. Although Cicero was a State highway and only the Bureau of Traffic Department could authorize a speed limit reduction, the State resident engineer testified that the defendant could have petitioned the Department for a speed reduction.

The jury was instructed that it was the duty of defendant to use

ordinary care for the safety of the plaintiff. Ordinary care was defined as the care a reasonably careful person would use under similar circumstances. The jury was also instructed that at the time of the accident there was an administrative regulation in force which provided that "surplus excavated material shall in no case be deposited at an elevation higher than that of the adjacent roadway without permission from the Engineer."

■■ Applying the *Pedrick* rule, we cannot conclude that the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors the defendant that the verdict for plaintiff could not stand.

In the alternative, defendant Engelhardt argues that the judgment in favor of the plaintiff should be reversed and the case remanded for a new trial because the verdict is against the manifest weight of the evidence.

■■■ In order to reverse the jury's verdict as against the manifest weight of the evidence, we must be able to say that a conclusion opposite to the verdict is clearly evident. (*Pozdro v. Dynowski* (1967), 83 Ill. App. 2d 79, 87, 226 N.E.2d 377.) Disputed factual testimony was presented in this case. Jurors are the sole judges of the credibility of witnesses and the weight to be accorded their testimony. (*Moore v. Checker Taxi Co.* (1971), 133 Ill. App. 2d 588, 594, 273 N.E.2d 514.) A court of review must take into consideration not only the verdict of the jury, but also the fact that the trial judge who also saw and heard the witnesses and argument of defendant's attorney denied the defendant's post-trial motions. (*Pozdro v. Dynowski.*) An analysis of the facts in this case indicates that the evidence can be interpreted to support the jury's verdict. We cannot say the verdict and judgment are manifestly against the weight of the evidence. Since this court has been presented with argument only as to why a judgment notwithstanding the verdict or a new trial should be granted in favor of defendant Engelhardt, a discussion of these issues as they might apply to defendant Meissner is not warranted here.

## II.

Defendants contend that plaintiff was guilty of contributory negligence as a matter of law.

■■ Plaintiff had a duty to exercise ordinary care for her own safety. If the record is barren of evidence of due care on plaintiff's part, then contributory negligence exists as a matter of law. But where, as here, the plaintiff's due care cannot be established by direct testimony, it may be inferred by the jury from all of the facts and circumstances shown to exist prior to and at the time of the occurrence. *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 507, 373 N.E.2d 1354.

■■ Since defendants seek judgment as a matter of law, defendants must show that all the evidence bearing on plaintiff's negligence when viewed

most favorably toward her, so overwhelmingly established her negligence that no verdict in her favor could ever stand. (*Connolly v. Melroy* (1978), 63 Ill. App. 3d 850, 853, 380 N.E.2d 863.) Where reasonable minds acting within the limits prescribed by law might reach different conclusions or draw different inferences from the facts, the question whether certain conduct was contributory negligence is for the jury. (*McCarthy v. River Forest Golf Club* (1978), 62 Ill. App. 3d 483, 484-85, 379 N.E.2d 19.) What constitutes contributory negligence cannot be defined in exact terms and each case must be determined on its own facts and circumstances. *Moran v. Gatz* (1945), 390 Ill. 478, 486, 62 N.E.2d 443.

■█ █ Whether plaintiff was negligent in attempting to cross a busy thoroughfare at midblock under the prevailing road conditions or in her conduct while standing on the edge of the road, presented factual, not legal, questions. There was no statutory prohibition against crossing the highway where plaintiff did. The jury was instructed that in force at the time of the accident was a statute that stated a pedestrian crossing outside a marked crosswalk "shall yield the right-of-way to all vehicles upon the roadway," and that notwithstanding this section "every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary." (See Ill. Rev. Stat. 1971, ch. 95½, par. 11—1003(a), (c).) Plaintiff cannot be held contributorily negligent as a matter of law because she did not cross in a marked crosswalk. *Moore v. Checker Taxi Co.* (1971), 133 Ill. App. 2d 588, 591, 273 N.E.2d 514.

Defendants rely on *Klimovich v. Crutcher* (1965), 57 Ill. App. 2d 444, 206 N.E.2d 723, as presenting a strikingly similar fact situation and in support of their position. In *Klimovich*, plaintiff attempted to cross Lake Short Drive at a point where there was no intersection or marked crosswalk for pedestrians. The roadway was at least two lanes wide in each direction of traffic. As plaintiff was crossing, traffic began coming from both the north and south causing plaintiff to stop at the center line. He waited there about three or four minutes and then proceeded. He was looking straight ahead when the defendant's car struck him from the side. In deciding whether the trial court properly directed a verdict and entered judgment in defendant's favor, the most important and perhaps controlling fact in the case was the existence of an overhead pedestrian bridge for traversing Lake Shore Drive located a short distance away. In finding recovery in plaintiff's favor unwarranted, this court stated that the overpass was an available alternative course of known safety and one which a reasonably cautious person faced with this type of situation would take into consideration in the exercise of due care for his own safety.

In the instant case, plaintiff crossed Cicero between 152nd and 153rd

Streets. Evidence was presented that there were no marked crosswalks or traffic signals regulating traffic on Cicero at these streets. The closest traffic control signals were located at 149th and 157th Streets. The 5′ high barricades extended along the entire construction area which included these streets and for all practical purposes, the plaintiff would be faced with the same or similar conditions regardless of whether she crossed at 152nd or 153rd Street.

Defendants rely on the police officers' testimony to the effect that as opposed to the normal 10′ to 12′ wide lane of traffic, Cicero's northbound lane was about 14′ or 14′5″ wide, thus allowing plaintiff enough room to stand on the pavement past the barricades without being in the way of traffic and have a clear view for about 1½ blocks to the south, the direction from which defendant Meissner approached. Defendants cite the rule that one may not look with an unseeing eye and be absolved of the charge of negligence by asserting that he looked but did not see. *Hardy v. Smith* (1978), 61 Ill. App. 3d 441, 444, 378 N.E.2d 604.

■■ ■ It has also been held that it is a question of fact for the jury to determine, in view of all the surrounding circumstances, whether the failure to look constitutes lack of due care. (*Morrison v. Flowers* (1923), 308 Ill. 189, 197, 139 N.E. 10; *Moran v. Gatz* (1945), 390 Ill. 478, 486, 62 N.E.2d 443.) Plaintiff's due care was to be judged by what an ordinary minor of her age, intelligence, and experience would have done under similar circumstances. In order to keep a constant lookout, it was necessary for plaintiff in the instant case to step out onto the road in front of the barricades. Although the lane of traffic was wider than usual, this would still place plaintiff in close proximity with passing cars. Plaintiff's friend testified that immediately before crossing, she and plaintiff looked both north and south but did not see defendant Meissner's car. Plaintiff's friend as well as defendant Meissner testified that plaintiff was walking not running across the street. There was evidence that defendant Meissner came up over a hill about 150′ to the south at a speed in excess of the 35 m.p.h. speed limit, and plaintiff was almost to the center line when struck. Considering these facts, we are of the opinion that the issue of plaintiff's contributory negligence was properly submitted to the jury.

III.

Defendants next contend that the trial court erred in admitting testimony about a prior accident.

Officer Lexow, who investigated the instant accident, testified that he also investigated an accident which occurred one week before the instant accident at approximately the same time of day, under the same type of weather conditions, and about 1½ blocks from where the instant accident occurred. According to the officer, the pedestrian in the prior accident as

in the instant accident had been standing on the east side of Cicero Avenue and was found lying in the northbound lane. Northbound vehicles were involved in both accidents. The officer testified that at the time of the prior accident, the condition of the road was the same as in the instant accident in that dirt piles were present, it was torn up, and the same type of barricades were positioned in the same manner.

Defendants argue that the prior accident occurred at a different location; that the officer did not know which direction the pedestrian had been walking; and that it was not clear whether the pedestrian in the prior accident was struck by a vehicle, and if so, whether he had been crossing the road or instead lying in the road as a result of a fall, physical ailment, or a prior accident unrelated to the incident investigated by the police. Defendants maintain that the prior accident occurred under substantially different circumstances, and the plaintiff failed to show a common cause connecting the two accidents.

Plaintiff contends that the testimony regarding the prior accident was relevant to show prior notice to defendant Engelhardt of the dangerous condition at the construction site.

■■ Although not admissible for the purpose of showing independent acts of negligence, evidence of a prior accident occurring under substantially similar conditions is admissible where it tends to show the common cause of the accidents to be a dangerous, unsafe condition and where it tends to show that defendant had notice of the existence of a dangerous condition. (*Wolczek v. Public Service Co.* (1930), 342 Ill. 482, 500, 174 N.E. 577; *Linneen v. City of Chicago* (1941), 310 Ill. App. 274, 282-83, 34 N.E.2d 100; *Moore v. Bloomington, Decatur & Champaign R.R. Co.* (1920), 295 Ill. 63, 67, 128 N.E. 721; *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 22, 310 N.E.2d 9.) The admissibility of such evidence depends on the facts of each case. *Phillips v. Shell Oil Co.* (1973), 13 Ill. App. 3d 512, 516, 300 N.E.2d 771.

■■ When admitted for the purpose of showing prior notice, the crucial factor in determining the admissibility of a prior accident is reasonable similarity. (*Grant v. Joseph J. Duffy Co.* (1974), 20 Ill. App. 3d 669, 678, 314 N.E.2d 478.) This is so despite a contention equivalent to that made here by defendants that the foundation for admittance was insufficient in the absence of showing the cause of the previous occurrence. (*L. C. Hollinghead v. Toledo, Peoria & Western R.R. Co.* (1976), 39 Ill. App. 3d 538, 541, 349 N.E.2d 98.) Once the plaintiff established that the prior accident occurred when the road and weather conditions were the same, that both pedestrians had been standing on the east side of the road and were found lying in the northbound lane, and northbound vehicles were involved, reasonable similarity existed.

■■ Defendants further argue that the prejudicial effect of the prior

accident was compounded when Officer Lexow was allowed to testify that after investigating the prior accident he made a recommendation to the chief of the police department, who in turn talked to the city engineer, in order to notify the State and the defendant contractor of the dangerous conditions. Lexow testified that letters were sent to the State superintendent in charge of the project and the defendant contractor. Defendant argues that there was no evidence as to the contents of those letters or the date, if any, on which they were received by the defendant; that the letters would have no bearing on whether defendant knew of the prior incident; and that the trial court recognized the letters should not have been introduced when it sustained an objection to mentioning the letters during closing argument by plaintiff's attorney. However, the record indicates that in closing argument, the plaintiff's attorney stated that after the letters were sent, certain precautions were taken. The trial court found no evidence had been presented to indicate that changes were made subsequent to or in response to the letters, and on that basis ruled the statement be stricken. We find no prejudicial error.

### IV.

Defendants next contend that giving of plaintiff's instruction No. 23 and the refusal to give defendants' instruction No. 3 were improper and prejudicial.

Defendants' instruction No. 3,[1] Illinois Pattern Jury Instruction, Civil, No. 10.01 (2d ed. 1971) (hereinafter IPI Civil) provided:

"When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide."

Plaintiff's instruction No. 23, a modified version of IPI Civil No. 10.01, provided:

"When I use the word 'negligence' in these instructions where they pertain to an adult, I mean the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.

---

[1] Although defendants' instruction No. 3 is marked given, defendants contend this was an error and instruction No. 3 was in fact not given. The conference on jury instructions reflects that defendants' instruction No. 3 was refused and plaintiff's attorney was ordered to submit an instruction on negligence. In view of this and the fact that plaintiff has not contested defendants' contention, we will assume defendants' instruction No. 3 was refused.

> When I use the term 'negligence' in these instructions where they pertain to a minor, I mean the doing of something or the failure to do something which a reasonably careful minor of the age, mental capacity and experience of the plaintiff would do or fail to do under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful minor would act under those circumstances. That is for you to decide."

Defendants contend that plaintiff's instruction is an incorrect statement of law and the result of a misconception as to the relationship between negligence and the standard of care. Negligence, defendants maintain, is a basic concept, one which remains constant regardless of the ages of the participants or the surrounding circumstances. It is the standard of care and not the definition of negligence, defendants argue, which must be adopted to the circumstances. It is defendants' contention that plaintiff's instruction incorrectly conveyed to the jury that the word "negligence" means different things under different circumstances and in effect lessened plaintiff's burden of proof by implying that the definition of negligence varied with age. To facilitate a better understanding of plaintiff's argument, an examination of *Charbonneau v. MacRury* (1931), 84 N.H. 501, 153 A. 457, the case upon which defendants primarily rely for support, is warranted.

In *Charbonneau*, a three-year-old plaintiff was struck by an automobile driven by a 17-year-old defendant. The court instructed the jury that the standard by which defendant's care should be measured was that of the average person of ordinary prudence acting under like circumstances and conditions. The court then stated it would modify that instruction to the extent that since defendant was a 17-year-old minor his conduct should be judged according to the average conduct of persons of his age and experience.

On appeal, plaintiff conceded that such an instruction would be applicable in determining a minor's contributory negligence, but contended that when a minor is a defendant no allowance should be made for his age or want of experience and he should be held to an adult standard of care. The Supreme Court of New Hampshire in great detail set out opposing authorities and divergent views on whether there should be different standards to determine a minor's primary and contributory fault. After concluding that there could be no distinction between the care required of a minor in his own protection and that required of him in his conduct toward others, the court went on to consider what type of instruction would be proper. The court began by stating that the law of negligence is founded on reasonable conduct or reasonable care under all the circumstances of the particular case, this rule being a fundamental and universal rule which remains constant. The court then considered what

would be an appropriate standard for determining "reasonable conduct" when the actor was a minor. The court stated, "[e]ither a new standard denoting the average person of the minor's age and development must be taken as the yardstick, or else allowance must be made of the minor's stage of development as one of the circumstances incident to the application of the general rule of reasonable care." (84 N.H. 501, 510.) The court found that as a practical matter it was not important which course was pursued but was inclined to approve the latter, since it supported the theory that reasonable care under all circumstances is a universal rule, and it would be easier to apply the law to the facts, whereas the former would impose upon the jury the duty to first set up a standard youth for each particular case from the composite factors of age and experience and then to apply that standard to the remaining circumstances in the case. The court believed that the general standard of care governing the conduct of adults, *i.e.*, reasonable conduct under all the circumstances, applies as well to minors and that the age and experience of a minor were merely evidential factors to be weighed with the other circumstances.

Of primary importance and what the defendants in the instant case fail to mention, is that the New Hampshire court held that even if the jury understood the instruction as setting up a special standard as to minors, it could not have affected their conclusion. The court stated:

"* * * The last sentence of the instruction at most purports to read into the rule of reasonable conduct the material circumstances of nonage and want of experience, leaving the rule, as thus modified, to be applied to the further material circumstances in evidence. It merely transferred from one side of the equation to the other an evidential fact; that is, it adds to the rule one of the items in evidence and subtracts it from the items properly to be considered in its application. The fact that such an instruction disregards the process of reasoning by which we arrive at the distinction between the rule and the factors to be considered in its application is of no controlling importance to the jury. It makes no difference to them whether the reason why they are to consider the factors of age and experience in judging the conduct of a minor is because such requirement is of the substance of a rule of law or is one incident to its application. As important as such distinction is to the court here in fixing the singleness and universality of the legal standard of care, any statement to the jury of the course of reasoning by which it is reached would have been of doubtful helpfulness to them." 84 N.H. 501, 513, 153 A. 457, 464.

Defendants attempt to analogize the case of *Diederich v. Walters* (1976), 65 Ill. 2d 95, 357 N.E.2d 1128, to the instant case on the basis that

the use of the tendered instruction in *Diederich* would have incorrectly lessened the burden of plaintiff just as the plaintiff's instruction in the instant case incorrectly lessened plaintiff's burden by implying that the definition of negligence varied with age. *Diederich* involved an action for the wrongful death of plaintiff's 13-year-old son who was struck and killed by defendant's automobile. The trial court refused to give plaintiff's tendered instruction which advised the jury as to the rebuttable presumption in Illinois that a child of 7 to 14 years of age is incapable of negligent conduct. The supreme court found that the presumption had been rebutted by sufficient evidence showing that the decedent failed to exercise the degree of care which a reasonably careful minor of the same age, mental capacity, and experience would exercise under the circumstances, and therefore the instruction on the presumption was not required.

We fail to see the applicability of the *Diederich* case to the instant case. Regardless of whether the plaintiff's or the defendants' instruction on negligence was submitted to the jury, the factors of the plaintiff's age, experience, and intelligence had to be considered in determining whether or not plaintiff was negligent. The academics of whether these factors should be incorporated into the definition of negligence itself or best left in the definition of ordinary care could be of no controlling importance to the jury. Illinois courts have long held that the test of correctness or propriety of instructions is not what meaning the ingenuity of counsel can, at leisure, attribute to them, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions. *Funk v. Babbitt* (1895), 156 Ill. 408, 415-16, 41 N.E. 166; *Reivitz v. Chicago Rapid Transit Co.* (1927), 327 Ill. 207, 213, 158 N.E. 380.

In the case of *Shaver v. Berrill* (1976), 45 Ill. App. 3d 906, 358 N.E.2d 290, the plaintiff, a minor, brought an action to recover damages for injuries she sustained when she was hit by defendant's automobile. IPI Civil No. 10.01 defining negligence and IPI Civil No. 10.05 defining a minor's standard of care were submitted to the jury. Also submitted to the jury was a special interrogatory which asked the jury if plaintiff was guilty of any negligence which proximately contributed to cause her injuries. The jury rendered a general verdict for the plaintiff but answered the special interrogatory adverse to the plaintiff. On appeal, plaintiff contended that it was error to use the word negligence in the interrogatory without defining therein the negligence of a minor. This court found that IPI Civil No. 10.01 defining negligence applied only to adults; that it imposed a greater standard on plaintiff than the standard required of a minor; and that technical language as used in the special interrogatory not properly understood by the jury should contain an

explanation of the meaning of such language. Although IPI Civil No. 10.05 defining a minor's standard of care had been submitted to the jury, this court found that the jury should have been told to consider the minor's age, capacity, and experience when determining the meaning of negligence as used in the special interrogatory.

The jury in the instant case was instructed that plaintiff had the duty to use ordinary care for her own safety, and that defendants had a duty to use ordinary care for the safety of the plaintiff. By submission of IPI Civil No. 10.02, entitled "Ordinary Care—Adult—Definition," the term ordinary care was defined for the jury as care a reasonably careful person would use under the circumstances. The giving of IPI Civil No. 10.05, entitled "Ordinary Care—Minor—Definition," informed the jury that a minor is not held to the same standard of conduct as an adult, and that with respect to the plaintiff, ordinary care meant that degree of care which a reasonably careful minor of the age, mental capacity, and experience of the plaintiff would use under the circumstances. By means of IPI Civil No. 10.06, entitled, "Standard of Conduct for Child—Violation of Statute or Ordinance," the jury was instructed that this same rule applied when a minor is charged with having violated a statute.

IPI Civil No. 10.01 is entitled "Negligence—Adult—Definition." Implicit in such a title is that the definition applies only to adults. But unlike the IPI instructions on ordinary care, there is no corresponding IPI instruction as to what constitutes the definition of a minor's negligence.

It is defendants' contention that IPI Civil No. 10.01 correctly defines the term negligence, and IPI Civil Nos. 10.02, 10.05, and 10.06 set forth the correct standard of care by which the negligence of a minor is to be judged. The submission of plaintiff's instruction on negligence, defendants argue, was repetitious in that it suggested that a minor is not held to the same standard of care as an adult which was again repeated in IPI Civil Nos. 10.05 and 10.06, and unduly emphasized the standard of care to be applied when judging the conduct of a minor.

■■ Merely because the court restates the law in another instruction does not necessarily mean that the court unduly emphasizes any point in favor of either litigant. (*Sankey v. Interstate Dispatch, Inc.* (1950), 339 Ill. App. 420, 430, 90 N.E.2d 265.) The terms "negligence" and "ordinary care" are two separate and distinct technical legal terms. That the court instructed the jury as to the meaning of negligence as applied to a minor and the meaning of ordinary care as applied to a minor did not in any way prejudice the rights of the defendant.

## V.

Lastly, defendants argue that the trial court should have admitted the testimony of William Keck, the attorney who prepared the plaintiff for

her deposition, for the purpose of impeaching the plaintiff's testimony.

At trial on direct examination, plaintiff testified that she had no independent recollection of the accident, and that the account of the accident which she gave at her deposition was based on information told to her by others. On cross-examination, plaintiff testified that she did not tell her attorneys that she had no independent recollection of the events of the accident until sometime after her deposition was taken but could not remember exactly how long afterward.

In an offer of proof, Keck explained his usual procedure for preparing a client for a deposition and the things he would have said to the plaintiff; that he did not recollect what he actually said to the plaintiff when he prepared her or whether he followed his usual procedure; and that plaintiff never told him after the deposition was taken that what she said at the deposition was incorrect. The trial court excluded this testimony on the basis that it was privileged communication.

Although defendants recognize the purpose of the attorney-client privilege is to protect information related in confidence, they argue that the privilege was not applicable here because the information was given to the public when the attorney testified at the offer of proof thus destroying any confidential nature it might have had.

■■ The attorney-client privilege has been said to exist: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." *People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205, *cert. denied* (1972), 409 U.S. 948, 34 L. Ed. 2d 218, 93 S. Ct. 289; 8 Wigmore on Evidence §2292 (McNaughton rev. 1961).

■■ In the instant case, the communications made between the plaintiff and her attorney in preparation for her deposition were related to the business and interest of the plaintiff, were meant to be confidential, and fell within the attorney-client privilege. This privilege belongs to the client, not the attorney, and it is immaterial that an attorney called as a witness is willing to disclose privileged communications. (*In re Estate of Busse* (1947), 332 Ill. App. 258, 266, 75 N.E.2d 36.) It is also immaterial whether the evidence relates to what was said by the attorney or what was said by the client. (*In re Estate of Busse*, at 267.) The fact that attorney Keck disclosed privileged communications in the offer of proof did not abrogate the privilege.

■■ ■ Defendants further contend that if the privilege did exist, the plaintiff waived it. The attorney-client privilege like most privileges, may be waived by the client when she voluntarily testifies to the privileged matter. (*Turner v. Black* (1960), 19 Ill. 2d 296, 309, 166 N.E.2d 588.) But

voluntary disclosure of confidential information does not effectively waive the privilege as to all conversations or the whole breadth of the discussion which may have taken place. (*Goldman, Sachs & Co. v. Blondis* (N.D. Ill. 1976), 412 F. Supp. 286, 288.) By voluntarily testifying as plaintiff did, that she told her attorney sometime after the deposition that she had no independent recollection of the accident, she waived the privilege and opened the way for Keck to testify concerning this particular matter. Keck should have been allowed, for purposes of impeachment, to testify that plaintiff never informed him of her lack of personal memory at the time of the deposition or afterward.

While we find the exclusion of this portion of Keck's testimony to be error, we do not find it so prejudicial as to constitute reversible error. The record reflects that at trial on cross-examination, plaintiff, when asked by one of the defense attorneys who was also present at plaintiff's deposition, whether she told either him or her own attorney at the time the deposition was taken that she could not remember anything about the accident, responded, "Not that I remember, no." Also on cross-examination, plaintiff's deposition testimony was used extensively for impeachment purposes. Plaintiff's treating physician testified that he had no record of any complaint made by plaintiff of memory loss. In their closing arguments, both defense attorneys pointed out the fact that plaintiff at the time of her deposition, did not reveal her lack of independent recollection. We also note that plaintiff's deposition was taken in October 1974, and that Mr. Keck left his place of employment the following spring. This trial began in November 1977. Sometime between October 1974 and November 1977, plaintiff's case was referred to the office of her trial attorney.

We are of the opinion that the jury was presented with sufficient information to determine the credibility of plaintiff's claim that she lacked personal recollection of the accident, and that the exclusion of the proffered testimony was harmless error.

Based upon the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.