CADRAL CORPORATION, Plaintiff-Appellant, v. SOLOMON, CORDWELL, BUENZ & ASSOCIATES, INC., Defendant-Appellee.

First District (3rd Division)   No. 83—1385

Opinion filed September 3, 1986.

Leon E. Lindenbaum, of Chicago (Walsh, Case, Coale, Brown & Burke, of counsel), for appellant.

Haskell & Perrin, of Chicago (John J. Lynch and Dion J. Sartorio, of counsel), for appellee.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Cadral Corporation, a condominium developer, brought a breach of contract action against defendant, Solomon, Cordwell, Buenz & Associates, its architect. Plaintiff sought to recover damages which resulted when defendant plotted plaintiff's high-rise condominium in a manner which violated a building-line restriction. The restriction had been created by a plat of resubdivision prior to the advent of the Chicago zoning ordinance. Following a trial on the merits, the jury returned a verdict in favor of defendant. On appeal plaintiff argues that the trial court erred (1) in denying plaintiff's motion for judgment notwithstanding the verdict, (2) in denying plaintiff's motion for a directed verdict on the issue of liability, and (3) in denying plaintiff's conditional motion for a new trial. We affirm.

The building involved here is located at 1555 North Astor Street, Chicago. The premises are part of a plat of resubdivision which was recorded with the Cook County recorder on November 26, 1904. The plat of resubdivision created a building line across the property 10 feet from the western property line, which runs along Astor Street. The effect of the restriction was that there could be no construction beyond the 10-foot line.

In January 1972, plaintiff, the owner and developer of the property, met with defendant, an architectural firm. The parties orally agreed that defendant would provide the architectural services necessary for the highrise condominium which plaintiff wanted to develop on its property. The parties entered into a written agreement on May 2, 1972. The contract was furnished by defendant. It is titled "Standard Form of Agreement Between Owner and Architect." The contract provides:

> "2.1 The Owner shall provide full information regarding his requirements for the project.
>
> * * *
>
> 2.3 The Owner shall furnish a certified land survey of the site giving, as applicable, *** restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site ***.
>
> * * *
>
> 2.7 The services, information, surveys and reports required by Paragraphs 2.3 through 2.6 inclusive shall be furnished at the Owner's expense, and the Architect shall be entitled to rely

upon the accuracy and completeness thereof.

2.8 If the Owner observes or otherwise becomes aware of any fault or defect in the Project or non-conformance with the contract documents, he shall give prompt written notice thereof to the Architect.''

Plaintiff acted as its own general contractor and developer through its agent, Charles G. Matthies, Inc. On May 3, 1972, defendant sent Charles G. Matthies a letter regarding various matters along with certain survey requirements. The letter stated, "We require a survey of the property to contain the following requirements as per the attached form." On May 16, 1972, at the request of Matthies, defendant sent its form survey requirements to Robert E. Biedermann of Gremley & Biedermann, so that Biedermann could perform the survey. The term "restrictions" does not appear on defendant's list of requirements.

On July 24, 1972, defendant received from Gremley & Biedermann a certified plat of survey. On the survey was a dashed line running the length of the property with the designation "10 ft. building line." Existing buildings were shown, and the western perimeters of these buildings appeared very close to, but did not exactly coincide with, the 10-foot building line. Defendant used the survey in preparing its plot plan for the proposed highrise, and the survey appears on the left side of defendant's plot plan. The plot plan shows that defendant used the concept of a reverse corner lot in siting the building. The advantage to using this concept was that the building could be pulled as far westward as possible so that the views from the building and the views from the neighboring building to the east would not be blocked. The plot plan shows that the western wall of the building was sited 6 feet 7 inches from the property line, which was in accordance with the zoning requirements for the area. Between November 1972 and April 1973, excavation of the premises was completed, and the caissons and some of the foundation walls were installed. In compliance with defendant's plot plan, the western foundation wall was set 6 feet 7 inches from the western property line.

In late April 1973, American National Bank, which had granted plaintiff a construction loan in February, conditional upon plaintiff submitting satisfactory evidence that the property and its use were in conformance with all applicable laws, ordinances and regulations, requested a foundation (spotted) survey. When plaintiff's agent, Helen Glennon, received the foundation survey on May 2, 1973, she realized that there was a problem because the western wall of the building extended beyond the 10-foot building line. Glennon contacted plaintiff's

president, Thomas Maley, and advised him of the problem. A meeting between plaintiff and defendant was arranged for the next day.

At the May 3 meeting, John Buenz, who had primary responsibility for drawing and designing the building, "guesstimated" that the cost of moving the building to conform to the 10-foot building line would be $500,000 to $1,000,000. The parties agreed that plaintiff would attempt to get title insurance to cover the problem. To this end, defendant obtained evidence of other building-line encroachments in the area, as well as an opinion letter from an attorney that these other encroachments rendered the building-line restriction unenforceable. Plaintiff submitted these documents to three title insurance companies. All three declined to issue coverage because the other encroachments were insignificant, and they did not wish to face the risk of any legal action that might be instituted by other owners of the resubdivision property.

Plaintiff and defendant next attempted to get consents from the other owners of property in the resubdivision. By mid-July, it was clear that these efforts would be unavailing. Meanwhile, construction of the building came to a halt on May 11, 1973.

Sometime in mid-July, Buenz advised plaintiff that transfer beams could be used to move the western wall of the building back 3½ feet to conform to the building line, but that this process would reduce the width of the building by that amount. This solution was unacceptable because the units would then be too small to be readily saleable.

In early August, Thomas Waldron, plaintiff's treasurer, saw an article in a newspaper about a new, luxurious condominium building in the area which offered larger units. Shortly thereafter, Maley sent Buenz a copy of the article and asked Buenz whether he could redesign the units in the building in a similar manner. Buenz was amenable to this suggestion. Whereas the originally designed building was to be a "deluxe" building containing 176 units, the redesigned building is a "luxury" condominium, which has an additional floor and only 113 units. The units are larger in the redesigned building and have more bedrooms and bathrooms. The redesigned units were meant to appeal to a different market from the one to which the original units were meant to appeal. The redesigned building has more saleable area than did the original building, due to the extra floor, elimination of balconies and less square footage in the public corridors.

A few days after Buenz was notified about the new concept in which plaintiff was interested for its building, Maley received a letter from The Engineers Collaborative, which Maley had contacted, regarding possible solutions to the building-line problem. This letter was

never shown to defendant.

During October and November 1973, the structural-revision work necessary to remedy the building-line violation was completed. Construction of the building resumed in early December.

Although plaintiff had anticipated a profit from the sale of the units in the building of at least $1,800,000, plaintiffs experienced losses totalling between $1,000,000 and $1,500,000.

■■ Plaintiff first argues that the trial court erred in denying its motion for judgment notwithstanding the verdict. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the supreme court set forth the standard by which such motions are to be decided. The court stated:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

According to plaintiff, even when the evidence relevant to the four critical issues on which the jury was instructed is viewed in the light most favorable to defendant, the evidence still so overwhelmingly favors plaintiff that no contrary verdict could stand. The four issues are: (1) whether plaintiff performed the conditions required of it under its contract with defendant pertaining to plaintiff's obligation to furnish the plat of survey, or alternatively, whether defendant undertook or waived compliance with the survey provisions; (2) whether defendant breached its duty to possess and apply the knowledge and use the skill and care that is ordinarily used by reasonably well-qualified architects in the locality in which they practice; (3) whether plaintiff suffered economic damages and (4) whether plaintiff's economic damages directly and naturally resulted from defendant's breach of the contract. Since we do not know the basis for the jury's decision, we shall discuss the evidence relating to each of these issues.

In regard to plaintiff's performance of its contractual obligation to furnish a plat of survey, plaintiff contends that the evidence established as a matter of law that the responsibilities required of it were performed. Plaintiff states that "[t]he relevant provisions of the May 2, 1972 Contract between defendant and plaintiff unambiguously required that notice of a site restriction need be given to defendant only by means of a certified land survey furnished at plaintiff's expense which duly showed such restriction." According to plaintiff, it is undisputed that defendant undertook the responsibility for providing the

surveyor with its survey requirements, that the surveyor furnished defendant with a certified land survey on July 24, 1972, and that plaintiff bore the expense of the survey. Since defendant failed to mention "restrictions" in its list of survey requirements, plaintiff argues, defendant is barred from claiming that plaintiff did not furnish it with due notice of the 10-foot building line. Plaintiff further argues that since the survey depicted a dashed line running across the lots which was designated "10 ft. building line," defendant was given due notice of the restriction.

■ We first consider the evidence relating to the question of waiver. The contract clearly states that plaintiff has the burden of obtaining a plat of survey, and its specifies that restrictions are to be shown. The contract also provides that the architect is entitled to rely upon the accuracy and completeness of the survey. The evidence shows that defendant initially sent its list of requirements to plaintiff's agent and general contractor, Matthies. At Matthies' request, defendant sent the same requirements to Gremley & Biedermann. We believe that this evidence presented a substantial factual dispute which precluded the entry of a judgment notwithstanding the verdict in regard to the issue of waiver. (See *Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 488, 394 N.E.2d 1241, 1247.) Viewing the evidence in its aspect most favorable to defendant, the jury could have determined that there was no waiver because defendant first submitted its requirements to plaintiff's agent, Matthies, who knew or should have known that these requirements did not conform to the requirements for which plaintiff was responsible under the contract, yet he directed that these incomplete requirements be sent to the surveyor.

■ We next address plaintiff's argument that the evidence conclusively shows that it fulfilled its contractual obligation in regard to the survey requirements because the survey showed the existence of the 10-foot building line. The determination of whether a contract has been performed according to its terms presents a question of fact. (*Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 172, 446 N.E.2d 1193, 1198.) It is undisputed that the 10-foot building line appeared on the survey. Nevertheless, there was substantial other evidence presented which raised a factual dispute as to whether plaintiff was required to supply additional information relating to the building line, and therefore plaintiff's motion for a judgment notwithstanding the verdict was inappropriate.

After plaintiff and defendant orally agreed in January 1972 that defendant would be the architect for plaintiff's proposed condominium, plaintiff supplied to defendant for defendant's use plans executed

by another architect but which plaintiff had decided not to utilize. There was no building line on these plans. More importantly, plaintiff's attorney, Michael Miselman, testified that he first saw the building line when he represented plaintiff in its purchase of the property at 1555 Astor, as the line appeared on the survey furnished by the seller. The survey contains the statement "Refer to Abstract or Deed for Building Restrictions." This survey was sent by Miselman to defendant in March 1972 as a preliminary survey. The cover letter sent with the survey did not mention or explain the building line. Also, the commitment policy from Chicago Title & Trust Company, which Miselman testified that he sent to plaintiff, showed the 10-foot building line typed in as a Schedule B exception. Miselman could not recall whether he advised plaintiff regarding the building-line restriction. Helen Glennon, who is also an attorney, testified that she looked at the commitment policy before sending it to American National Bank in regard to plaintiff's financing, but she did not discuss the 10-foot building line exception with anyone.

The surveyor, Robert Biedermann, testified that Matthies had previously hired his firm to do over 100 surveys. Approximately one-half of these surveys would have shown building lines, and Biedermann believed that Matthies knew what a building line was based on Matthies' prior experience. Biedermann further testified that a building line is normally shown on a survey as a dashed line designated "building line," but he acknowledged that one of the surveys of the property involved here prepared by his company showed the building line as a light, solid line.

Biedermann stated that the survey requirements he received from defendant were unusual in that they were not as extensive as most requirements he receives, and defendant did not ask to have the survey done in compliance with the Illinois Land Survey Standards. Even though defendant did not request that building lines be shown, Biedermann nevertheless included the 10-foot building line on the survey. Biedermann testified that he sent four copies of the survey to Matthies.

Thomas Maley, plaintiff's president, testified that the first time he saw a survey was in May 1973 when Glennon brought the building line problem to his attention. He did not request to see the final plans for the building before construction started, and to his knowledge, no one else connected with plaintiff had reviewed the plans. The final plans appeared at plaintiff's offices "very mysteriously" after May 2, 1973. Maley identified a memorandum he wrote in July 1973 in which he noted that plaintiff's attorney had informed him that plans in

plaintiff's possession showing the garage 6 feet 7 inches from the property line would be the basis for defendant's contention that plaintiff knew about the violation.

Thomas Waldron, plaintiff's treasurer, testified that he and Matthies made the ultimate decisions concerning approval of plans. He defined a building line as a line past which a building could not be built. His approximately 30 to 40 meetings with defendant concerned only floor plans. He did not see the plot plan prior to being advised of the building-line problem.

Charles Matthies testified that he has been involved in the construction of condominiums since 1963. He denied that 50% of the surveys he had previously received from Gremley & Biedermann had building lines. Matthies believed that a building line was what was in the zoning book. Matthies further testified that he must have seen the survey for 1555 Astor Street, and that defendant showed him its preliminary plans and asked for his comments. Matthies stated that he approved the final plans as plaintiff's agent.

Patrick Culhane, plaintiff's secretary, testified that a building line is a line in front of which a building must be constructed. This witness stated that he attended the closing when the property was purchased. He reviewed the title commitment, which showed the 10-foot building line. The deed, which he also reviewed, says "subject to building lines of record."

Other witnesses testified to various definitions of a building line. While some witnesses defined a building line as a restriction, not all of the witnesses defined a building line in that manner. Thomas Humes, who designed the building, described a building line as being where the foundation for building walls is poured. Buenz, who reviewed Humes' work, defined the term as the footprint of the building at grade. Charles Correa, president of LBC, Inc., which supervised construction on the project, stated in his deposition, which was admitted at trial, that "building line" refers to the building being laid out.

We believe that the evidence raised a substantial question of fact as to whether plaintiff fulfilled its contractual obligations to provide defendant with a plat of survey which showed restrictions and which was complete and accurate. It was for the jury to decide whether to accept the evidence presented by plaintiff that its duties under the contract were fulfilled by the presence of the building line on the survey. The jury could have believed defendant's evidence which showed that the mere presence of the building line on the survey did not adequately apprise defendant that the line was a restriction, and that plaintiff and its agents had critical information regarding the building

line in their possession, yet failed to provide this information to defendant. The credibility of the witnesses was clearly a factor here, and this determination is peculiarly within the province of the jury to decide. Therefore, the trial court properly denied plaintiff's motion for judgment notwithstanding the verdict to the extent that it was based on plaintiff's performance of the contract.

Our conclusion is not altered by the supreme court decision in *Simpson v. Mikkelsen* (1902), 196 Ill. 575, 63 N.E. 1036, upon which plaintiff relies. In *Simpson*, the court found that the presence of a dashed line with the written words "Building line fifty feet north from boulevard line" on a plat of subdivision clearly apprised the defendant of the restriction. The court observed that "[t]he term 'building line' is not of doubtful or obscure meaning, but is a well understood term when used upon town or city plats." (196 Ill. 575, 578, 63 N.E. 1036, 1037.) *Simpson*, however was decided prior to the advent of zoning. In the present case, defendant presented evidence that the term "building line" has become doubtful and obscure and is currently subject to various interpretations. These considerations were neither presented nor discussed in *Kessler v. Palmeri* (1972), 3 Ill. App. 3d 901, 278 N.E.2d 813, which followed *Mikkelson* and is also cited by plaintiff.

■ We next consider the evidence regarding whether defendant breached its duty to possess and apply the knowledge and use the ordinary skill and care that is ordinarily used by reasonably well-qualified architects in the locality. In *The Himmel Corp. v. Stade* (1977), 52 Ill. App. 3d 294, 298, 367 N.E.2d 411, 414-15, this court stated:

> "Architects and engineers represent themselves to be competent in the preparation of plans and specifications necessary to the construction of suitable structures, including but not limited to the knowledge of and compliance with applicable building codes ***."

Plaintiff argues that defendant's failure to prepare its plot plan in accordance with the 10-foot building line on the survey constitutes a breach of duty as a matter of law.

The testimony shows that prior to receiving the plat of survey, Humes and Buenz prepared a plot plan based on the Chicago zoning ordinance and schematic drawings supplied by plaintiff. These drawings had been prepared by another architect and did not show the building line. Humes testified that the partial survey which plaintiff supplied in March 1972 showed three existing buildings on the 10-foot line. When he received the completed survey in July 1972, he noticed the building line. Although he was familiar with the term "building

line," he had not previously seen a building line on a plat of survey. His understanding of a building line was that it is "where the foundation walls of the building are poured." He specifically defined a building line as "a line close to existing buildings on the premises and possibly close to the western walls of subsurface foundations of demolished buildings."

Buenz testified that he had primary responsibility for the design of 1555 Astor. He did not notice the building line on the plat of survey. He defined a building line as the footprint of the building.

Biedermann testified that he realized that the building had been plotted over the building line when he did the layout work for the building in December 1972. He told John Techsky of LBC, and Techsky told Biedermann not to worry because they had their permits from the city. Biedermann did not inform Matthies or defendant of the problem, as he assumed that waivers had been obtained. Biedermann knew that the city permits were unrelated to the building line. In regard to the meaning of "building line," Biedermann testified that people in construction, but not surveyors, use this term with respect to foundation walls. Moreover, no architect or builder would think that "building line" meant the perimeter of a building.

Plaintiff presented Henry Mikolajczky, a registered architect, registered professional engineer, full professor of building technology and materials, and an architectural consultant, as its expert witness. He testified that a building line is a line beyond which a building may not be constructed, and he stated that this definition was generally known by architects in 1972. Such restrictions could be established by ordinance, by plat of survey or subdivision, or by mutual agreement of property owners. Plaintiff's expert witness further testified that a dashed line across a plat was generally known not to relate to the perimeter of a building. He believed that a reasonably careful architect would have concluded that the building line was a setback, and Humes should have investigated the meaning of the term when he saw it on the plat. Also, Buenz should have noticed the building line. The witness concluded that defendant did not use the ordinary care and skill required by an architect.

During cross-examination, Mikolajczky admitted that he did not look at the contract between plaintiff and defendant and did not know what their respective obligations were. His knowledge of the building-line problem was based only on what the attorneys told him. The authoritative texts reviewed by this witness showed that "building line" can have different meanings, and the texts did not describe "building line" as a restriction created by deed or plat of subdivision. One of

the texts defined a building line as a line beyond which the law prohibits building, while other texts referred an architect to the building codes and zoning ordinances.

Defendant's expert, Louis Jacobs, a consulting architect, engineer and planner, testified that building lines are not found on many maps in the city. Relying on the contract, the plans and surveys, and other information, Jacobs testified that defendant was not advised that the 10-foot building line was a restriction. The witness admitted that he had not previously heard the definition of building line testified to by Humes, but that Humes acted properly in regard to Chicago zoning and building permits. In Jacobs' opinion, defendant prepared its plans with the skill and care normally used by reasonably well-qualified architects.

Charles Matthies' testimony in regard to the building line was that to him it was "what was in the zoning book." He had never run into "something like this" before. He contradicted testimony given by Biedermann that approximately one-half of the surveys Gremley & Biedermann had previously done for him contained building lines.

Finally, Charles Correa's deposition testimony included Correa's statement that he did not ever recall seeing a survey with a building line on it. In his experience, the owner would inform the contractor of any restrictions. The contractor would inform the architect, who in turn would inform LBC, Inc.

■ We believe that there was sufficient evidence favoring defendant in regard to the issue of whether defendant acted with the requisite degree of skill and care in plotting the building to defeat plaintiff's claim that this issue should have been decided in its favor as a matter of law. The evidence presented by defendant showed that the term "building line" is susceptible of more than one definition, and it further showed that the term is no longer frequently encountered on surveys. The testimony presented by plaintiff's expert witness was not conclusive on the issue of defendant's degree of skill and care, but was merely one factor to be considered by the jury, especially since the expert's testimony was not based upon the documents relevant to the case and the authoritative texts about which he testified did not define "building line" strictly in accordance with his understanding of the term. We conclude that there was adequate evidence on this issue to provide a basis for the jury to find that defendant used the care and skill ordinarily used by reasonably well-qualified architects.

■ The third critical issue raised by plaintiff, that it suffered economic damage, is not disputed. There was uncontradicted evidence presented regarding plaintiff's loss of approximately $1,100,000 to

$1,500,000. Accordingly, we shall now address the fourth issue raised by plaintiff in regard to the motion for judgment notwithstanding the verdict, namely, whether plaintiff's losses were caused by defendant's breach of contract. We conclude that even if the jury determined that defendant had breached the contract, the jury nevertheless could have found, based on the evidence, that the breach was not the cause of plaintiff's losses.

The building, as originally designed, was to be 46 stories tall and contain 176 units. It was described by plaintiff as "deluxe." The original prices on these units were $50,000 to $90,000. In January 1973, plaintiff estimated a profit on the building of $1,162,000. As of April 1973 this estimate was raised to $1,800,000.

After the building-line problem arose, plaintiff, upon viewing a newspaper article that discussed a luxury condominium being built in the area, asked defendant to redesign the building based on a similar concept. The decision to utilize this concept was based on the expertise of Maley, Waldron and Matthies. The new design was meant to appeal to a different market. There was no independent study made to analyze potential buyers for a luxury condominium. The redesigned building had 113 units and an additional story. The final prices on these units ranged from $80,000 to $212,000.

In his testimony relating to the decision to redesign the building, Maley stated that defendant had said it could not move the originally designed building back behind the building line, However, Maley also testified that he did not know if anyone had shown defendant the report from The Engineers Collaborative which suggested that the originally designed building could be moved back by the use of transfer beams. Maley's testimony in this regard was impeached by testimony from his deposition where he stated that the decision not to "push forward with [the suggestion from The Engineers Collaborative] would have been based on the marketing philosophy behind the [luxury] concept as opposed to the concept behind the originally designed structure."

On November 29, 1973, which was shortly before construction resumed, plaintiff sent a letter to the Federal Home Loan Bank in which it stated that the new structure was expected to show the same profit as the original. Maley testified at trial that this projection was wrong, and the projected profit on the original building could well have been greater. Maley admitted that he did not have experience in projecting profits on new construction of a highrise condominium.

Henry Kemmann testified that he was in charge of plaintiff's accounting records. He stated that he had no personal knowledge that

the costs which exceeded the receipts related to the building-line problem.

Waldron testified that he was the one to make the decision to redesign the building, although he would have preferred going with the originally designed units. Matthies set the prices for the units. As of November 1974, the projected profit was $2,340,000.

According to the testimony given by Matthies, he had not previously been involved with a highrise condominium. When construction started on the original building, plaintiff received inquiries regarding larger units. Matthies stated that he set the costs for both the original and the redesigned buildings, based on costs and what he thought the market would bear. His March 13, 1973, price list showed total prices of $14,348,800. His February 20, 1974, price list for the redesigned building totalled $15,230,700. Matthies stated that this increase reflected what was lost in time and costs and increases due to the redesign of the building. In November 1974, there was an additional price increase of $583,700. This increase reflected in part higher commissions for the sales people. Final prices were established as of May 5, 1975. Once the prices were set, they were never lowered.

Donald Witt, who was the appraiser for the financial institution of which Maley and Waldron were officers, testified that he had appraised the original building at $13,662,000. His appraisal of the redesigned building in April 1974 was $15,438,000, and this was increased to $16,230,300 in July 1974. He stated that the market for real estate changed during this period. Witt believed that the increase would have been at least as great, if not greater, in the original building.

Various witnesses testified to cost increases which plaintiff claimed related to the building-line problem. These amounts included: $773,437 for labor and materials; $96,622 for corrective work; $208,465 for increased interest on loans; $10,360 for maintenance costs; and $25,437 for revised architectural plans.

In addition to the testimony regarding the redesigned building, the prices of the condominium units, the appraisals, and the costs attributed by plaintiff to the building-line problem, there was substantial testimony regarding plaintiff's sales program. Maley testified that Matthies, who had headed the program, had not previously sold highrise condominium units. He further testified that selling is crucial and that the general rule is to sell as quickly as possible in order to avoid greater interest payments. Under Matthies' agreement with plaintiff, Matthies was to receive one-third of all profits but would not be responsible for any losses. Although Maley testified that Matthies did

fine as a salesman, defendant introduced evidence showing that Maley had been extremely critical of Matthies' performance. In April 1974, Maley had complained that there was no formal, organized sales activity and that there was a paucity of signed contracts. In a memorandum dated June 20, 1975, based on a telephone conversation with Matthies, Maley stated that construction had proceeded at a pace and quality expected, and that the next 90 to 120 days would be the most critical and would determine the success or failure of the project. Maley noted that corrective work was three to four weeks behind and needed Matthies' continuing supervision. Maley expressed concern with the "attitude of casualness," which plaintiff "could not continue to tolerate." Almost nine months later, Maley sent Matthies a letter regarding Matthies' lack of concern about the probable loss of a sale, which, in fact, was never consummated. In December 1976, Matthies was paid $50,000 based on an anticipated profit. This money was later returned when no profit materialized.

Waldron testified that he had concurred in the complaints about Matthies attested to by Maley. In July 1975, Waldron sent Maley a letter deploring the decoration and furnishing of some of the models. Waldron further testified that there were no complaints about Maley's performance after early 1976 and that Matthies hired people who had experience with selling highrise condominium units. The $50,000 paid to Matthies in December 1976, based on anticipated profits, was acknowledged by Waldron.

We believe that there was sufficient conflicting evidence and questions of credibility to preclude the entry of a judgment notwithstanding the verdict in regard to damages. While it is clear that the building-line problem was costly to plaintiff, there was evidence which, if believed by the jury, showed that such losses were recouped in various ways and that the losses sustained by plaintiff were unrelated to the building-line problem.

The evidence shows that as a result of the building-line problem, plaintiff was able to redesign its "deluxe" building into a "luxury" building, where the units commanded premium prices for their spaciousness and expansive views of the lake and park. Although Maley, Waldron and Matthies testified that they preferred the originally designed building because the smaller units would have been more saleable, Matthies also testified that he had received inquiries regarding larger units when construction on the new building started. That plaintiffs considered the redesigned building more advantageous is also evidenced by the fact that plaintiff never asked defendant if it could redesign the interior of the building as a "deluxe" building, and it never

showed defendant The Engineers Collaborative report. The decision to redesign the building as a luxury building was triggered by a newspaper article and was based on the expertise claimed by Maley, Waldron and Matthies, none of whom had previously been involved in the development of a highrise condominium.

In addition, Matthies testified that one of the price increases he instituted was intended, in part, to make up for losses attributable to the building-line problem. Moreover, Maley, in his November 29, 1973, letter to the Federal Home Loan Bank, estimated that the anticipated profit on the redesigned building was the same as that for the original building. The jury was not required to accept Maley's testimony that his estimate was wrong and that he was not experienced in making such estimates, and yet find that Maley was knowledgeable in making the other estimates of profit which were presented to the jury during plaintiff's attempt to establish its losses.

The testimony regarding the two appraisals of the building made in 1973 and 1974, which plaintiff claims showed that the redesigned building was worth less than the originally designed building was hardly conclusive. Witt's appraisals described the two buildings in almost identical terms, and showed a substantial increase in the building's value between 1973 and 1974. Witt's testimony that this increase was less than that found in comparable buildings, although uncontradicted, nevertheless raised questions concerning the accuracy of his method of comparison.

The testimony in regard to the renegotiation of subcontracts due to the building-line problem came mainly from Teschky. His testimony, however, was contradictory regarding specific increases in certain subcontracts, and his estimates of the percentage of increase for the entire project during the seven-month work stoppage were also shown to be conflicting. Teschky admitted that he did not compute the damages to which he testified by the usual procedure that he used when he prepared the cost estimates on the project. In fact, some of his damage estimates were shown to be flawed during cross-examination. Teschky further admitted that some of the increased costs were due to the addition of an extra floor on the redesigned building and to certain luxury features that were added to the building.

Finally, there was substantial evidence that plaintiff's losses were not caused by the building-line problem but the deficiencies in plaintiff's sales program. The evidence showed that plaintiff believed the sales phase to be critical to the success of the project and that Matthies failed to adequately perform his duties in this regard. As late as November 1974, plaintiff was estimating a profit of $2,340,000, and in

December 1976, plaintiff paid Matthies $50,000 based on anticipated profits. Thus, there was sufficient evidence from which the jury could have concluded that plaintiff's losses were not caused by the 1973 building-line problem.

■ In sum, applying the *Pedrick* rule to the facts of this case, we cannot conclude that the evidence, when viewed in its aspect most favorable to defendant, so overwhelmingly favors plaintiff that no contrary verdict could stand. Where there exists a substantial factual dispute, or where the assessment of a witness' credibility and the election between conflicting evidence may be decisive, a judgment notwithstanding the verdict is inappropriate. (*Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 488, 394 N.E.2d 1241, 1247.) We believe that there were both substantial conflicts in the evidence and questions of credibility in regard to each of the three critical issues that we have discussed. After due deliberation, the jury resolved these conflicts and questions in favor of defendant. Verdicts should not be set aside merely because juries could have found differently or because judges feel that other conclusions would be more reasonable. (*Lode v. Mercanio* (1979), 77 Ill. App. 3d 140, 155, 395 N.E.2d 1014, 1018.) Accordingly, the trial court did not err in denying plaintiff's motion for judgment notwithstanding the verdict.

Plaintiff next argues that the trial court erred in denying plaintiff's motion for a directed verdict on the issue of liability made at the close of all the evidence. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the supreme court determined that the standard for a directed verdict is the same as that used in regard to judgments notwithstanding the verdict. (37 Ill. 2d 494, 498-99, 229 N.E.2d 504, 507.) The court observed that directed verdicts and judgments notwithstanding the verdict serve similar functions:

> "Trial courts direct verdicts in order to promote the efficient and expeditious administration of justice where no substantial factual disputes exist. To the same end they enter judgments *n.o.v.* \*\*\* in situations where verdicts are not factually sustainable." (37 Ill. 2d 494, 504, 229 N.E.2d 504, 510.)

Plaintiff again argues here that "the evidence established as a matter of law that the Survey furnished to defendant at plaintiff's expense satisfied plaintiff's obligation under the Contract and that defendant breached the Contract by preparing a plot plan which sited the Building beyond the '10 ft. building line' shown on the Survey." In view of our determination that a jury verdict for defendant based on a finding of no liability could stand under the *Pedrick* rule, we conclude that the trial court did not err in denying plaintiff's motion for a directed ver-

dict on the issue of liability made at the close of all the evidence.

Plaintiff's final argument is that the trial court erred in denying its conditional motion for a new trial. We disagree.

The standard applicable to a motion for a new trial is different from the standard applied when a party seeks a judgment notwithstanding the verdict. On a motion for a new trial, the court must weigh the evidence, and a new trial will be granted only if the verdict is contrary to the manifest weight of the evidence. (*Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 1087, 401 N.E.2d 1145, 1153.) A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly apparent or the verdict is palpably erroneous and clearly unwarranted. (*Lode v. Mercanio* (1979), 77 Ill. App. 3d 150, 156, 395 N.E.2d 1014, 1019.) A motion for a new trial is addressed to the trial court's discretion, and the trial court's decision will not be disturbed unless there is a clear abuse of discretion that affirmatively appears on the record. (*Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 1087, 401 N.E.2d 1145, 1153.) A court of review must take into consideration not only the verdict of the jury, but also the fact that the trial judge, who saw and heard the witnesses and the arguments of counsel, denied the moving party's post-trial motions. *Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 489, 394 N.E.2d 1241, 1248.

Here, plaintiff does not raise any specific errors which occurred at trial. The jury saw and heard the witnesses and reflected upon the considerable amount of evidence presented by both parties. Based on the evidence which we have previously discussed, we cannot say that the jury's verdict is contrary to the manifest weight of the evidence. The trial judge, who saw and heard the evidence and arguments presented to the jury, denied plaintiff's post-trial motions. There is nothing which affirmatively appears on the record which suggests that the trial court abused its discretion in denying plaintiff's motion for a new trial. Even though a less conclusive evidentiary situation is necessary to justify a new trial than is necessary before a verdict is directed (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509-10, 229 N.E.2d 504, 513), we do not believe that the record shows that a new trial is warranted. We therefore find no error in the trial court's denial of plaintiff's conditional motion for a new trial.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McGILLICUDDY and WHITE, JJ., concur.